**FILED**
JAMES J. WALDRON

APR 2 3 2013

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In Re:<br><br>**U.S. MORTGAGE CORP. & CU NATIONAL MORTGAGE, INC.,**<br><br>Debtors. | Chapter 11<br><br>Case No.: 09-14301(RG) |
| **EDWARD BOND, Liquidating Trustee**<br><br>Plaintiff,<br><br>v.<br><br>**VINING SPARKS,**<br><br>Defendant. | Adv. No.: 11-1212(RG) |
| **EDWARD BOND, Liquidating Trustee**<br><br>Plaintiff,<br><br>v.<br><br>**NEWBRIDGE SECURITIES CORP.,**<br><br>Defendant. | Adv. No.: 11-1218(RG)<br><br>**OPINION** |

APPEARANCES:

Forman Holt Eliades Ravin & Youngman LLC
BY:   Erin J. Kennedy, Esq.
      Brigette G. McGrath, Esq.
80 Route 4 East
Paramus, New Jersey 07652
*Attorney(s) for Edward Bond, Liquidating Trustee*

Ravin Greenberg LLC
BY:   Brian L. Baker, Esq.
      Chad B. Friedman, Esq.
101 Eisenhower Parkway
Roseland, New Jersey 07068
*Attorney(s) for Defendant Vining Sparks IBG, L.P.*

[1]

Baker Donelson Bearman Caldwell & Berkowitz, PC
BY:    E. Franklin Childress, Jr., Esq.
          Bradley L. Ottinger, Esq.
165 Madison Avenue
Suite 2000
Memphis, Tennessee 38103
*Attorney(s) for Defendant Vining Sparks IBG, L.P.*

Todtman Nachamie Spizz & Johns, PC
BY:    Alex Spizz, Esq.
          Jill L. Makower, Esq.
425 Park Avenue
New York, New York 10022
*Attorney(s) for Defendant Newbridge Securities Corp.*

Riker, Danzig, Scherer, Hyland & Perretti, LLP
BY:    Mark E. Hall, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
*Attorney(s) for J.P. Turner & Co. LLC*

Newbridge Securities, Inc.
BY:    Arnold Levine, Esq.
1451 W. Cypress Creek Road
Ft. Lauderdale, FL 33309

Rosemary Gambardella, Bankruptcy Judge

## MATTER BEFORE THE COURT

The matters before the Court are the Motions of Defendants Vining Sparks IBG, L.P. ("Vining Sparks") and Newbridge Securities Corp. ("Newbridge"), each of whom have filed a Motion to Dismiss separate Adversary Complaints of Edward P. Bond, Liquidating Trustee ("Trustee") for Debtors U.S. Mortgage Corp. ("U.S. Mortgage") and CU National Mortgage ("CU" and collectively, "Debtors"). Additionally before the Court in the Adversary Proceeding No. 11-1212, *Bond v. Vining Sparks*, is Trustee's Application in Support of Cross-Motion for an Order Authorizing the Liquidating Trustee to File an Amended Complaint. The Court held a

hearing on December 1, 2011.   The following constitutes the Court's findings of fact and conclusions of law.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

I.   *Background*

U.S. Mortgage was a licensed mortgage banker that originated and brokered residential mortgage loans to the public.   Its president, Michael J. McGrath, Jr., ("McGrath"), was also the controlling shareholder during its existence.   CU National was a wholly-owned subsidiary of U.S. Mortgage that was also operated by McGrath in his role as president and controlling shareholder.   The Trustee alleges here that at all relevant times, U.S. Mortgage and CU National were alter egos of McGrath, and that prior to the CU National petition date, through McGrath and/or McGrath and his wife Susan McGrath, the Debtors held brokerage accounts with the Defendants.   *See* Am. Compl. ¶¶ 10-14, *Bond v. Newbridge Secs. Corp.*, No. 11-1218-RG (Bankr. D.N.J. June 2, 2011), ECF No. 3 ("Newbridge Am. Compl."); Proposed Am. Compl. ¶¶ 10-14, Cross-Mot. for Order Authorizing Am. Compl. ex. A, *Bond v. Vining Sparks IBG, L.P.*, No. 11-1212-RG (Bankr. D.N.J. June 2, 2011), ECF No. 4-2 ("Vining Sparks Am. Compl.").

In or about 1996, U.S. Mortgage was licensed to be a designated seller and servicer of loans for Fannie Mae, and in or about 1998, it entered the business of processing, servicing, and sometimes selling to Fannie Mae mortgage loans originated and/or funded by credit unions. Those loans were either sold to Fannie Mae by authorization of the credit unions or were serviced by CU National, which collected the monthly payments of principal, interest, and any escrows for taxes and insurance from the borrowers and transmitting those payments to the credit unions.   Newbridge Am. Compl. ¶¶ 15-18; Vining Sparks Am. Compl. ¶¶ 15-18.   If U.S. Mortgage received express written authorization to sell the loans to Fannie Mae, U.S. Mortgage

[3]

serviced the loans by collecting the monthly payments of principal, interest, and any escrows for taxes and insurance from the borrowers and transmitting those payments to Fannie Mae. Those payments were earmarked and maintained in segregated bank accounts. Newbridge Am. Compl. ¶¶ 19-20; Vining Sparks Am. Compl. ¶¶ 19-20. Proceeds from the latter type of loans (with payments remitted to Fannie Mae) were deposited into U.S. Mortgage's operating account, and U.S. Mortgage was required to pay the credit unions upon receipt of those loan proceeds. Newbridge Am. Compl. ¶¶ 22, 24; Vining Sparks Am. Compl. ¶¶ 22, 24. The Debtors used the operating account to pay their payroll and operating expenses.

The Trustee asserts here that after several years of operation, McGrath caused the Debtors to engage in fraudulent practices on a massive scale. These frauds included: (1) the use of loan proceeds from the sale of the Fannie Mae Loans in order to resolve cash flow problems, Newbridge Am. Compl. ¶¶ 25-26; Vining Sparks Am. Compl. ¶¶ 25-26, and delaying the remittance of the Fannie Mae loan proceeds to the credit unions, delays that initially lasted only short periods of time and eventually stretched to two years or more, Newbridge Am. Compl. ¶¶ 28-30; Vining Sparks Am. Compl. ¶¶ 28-30;  (2) the fraudulent sale by U.S. Mortgage of some of the loans serviced by CU National, which involved McGrath's misrepresentation that he was an officer of the credit unions and the execution of false assignments, Newbridge Am. Compl. ¶¶ 33-34; Vining Sparks Am. Compl. ¶¶ 33-34; and (3) the alleged fraudulent sale of over $20,000,000 of loans to Fannie Mae that were not serviced by the Debtors and the resulting modifications of the loan servicing system to conceal that sale, such that Fannie Mae would receive loan servicing information and monthly payments; and (4) various investments made using the Debtors' funds in an effort to raise the funds required to cover the Debtors' operational

[4]

expenses and to conceal the fraudulent activities ("The Investment Scheme".) Newbridge Am.
Compl. ¶¶ 38-40; Vining Sparks Am. Compl. ¶¶ 38-40.

Most relevant to the instant adversary proceedings, during the period of the fraudulent
activities, McGrath further "engaged in various investments" using the Debtors' funds to try to
raise the funds required to cover the Debtors' operational expenses and to conceal the fraudulent
activities. In the Amended Complaints, the Trustee alleges that "Upon information and belief,
because of the frequency of their trading activities," the Debtors (through McGrath) were top
revenue generators for the brokerage firms with which they did business and had direct access to
the owners and/or high level executives of the brokerage firms. The Trustee further alleges that
due to the high frequency of trades, the brokerage firms excused the Debtors and McGrath from
following "certain guidelines and regulations the brokerage firms required of their investors."
Newbridge Am. Compl. ¶¶ 40-43; Vining Sparks Am. Compl. ¶¶ 40-43.

On June 11, 2009, the U.S. Attorney for the District of New Jersey filed a criminal
information ("Criminal Information") against McGrath, alleging that all of the fraudulent
activities mentioned above were part of a criminal conspiracy that caused more than $100
million in losses. Newbridge Am. Compl. ¶¶ 44-45; Vining Sparks Am. Compl. ¶ 44-45
(incorporating the Criminal Information by reference). In the Criminal Information, the U.S.
Attorney alleged that "the object of the conspiracy, which caused more than $100 million in
losses, was to fraudulently sell Credit Union Loans and to use the proceeds to finance [U.S.
Mortgage's] operations and fund McGrath's personal investments and investments made on
[U.S. Mortgage's] behalf." Newbridge Am. Compl. ¶¶ 45; Vining Sparks Am. Compl. ¶ 45
(both quoting Criminal Information ¶ 8). Further, the U.S. Attorney alleged, in order to conceal
the fraudulent sales of Credit Union Loans to Fannie Mae, U.S. Mortgage employees would

transfer the proceeds of the sales from U.S. Mortgage's bank account into bank and brokerage

accounts "controlled by defendant McGrath individually, with his wife jointly, through his

corporate alter egos or for [U.S. Mortgage]." Criminal Information ¶ 15.  In order to conceal

over $100 million in transfers "back and forth between [U.S. Mortgage's] bank accounts and

bank and brokerage accounts controlled by or benefitting defendant McGrath," the U.S. Attorney

alleged that McGrath directed U.S. Mortgage employees to create false accounting records and

bank statements. Criminal Information ¶ 16.  The same day the criminal information was filed,

McGrath pled guilty to the charges set forth in it and allocated to the stated allegations.

Newbridge Am. Compl. ¶ 46; Vining Sparks Am. Compl.  ¶ 46.

As to Vining Sparks, the Trustee alleges that Bill Thompson was the Defendant's account

representative that assisted and advised the Debtors and/or McGrath, and as to Newbridge

Securities, John Slipek was the Defendant's account representative that assisted and advised the

Debtors and/or McGrath. Vining Sparks Am. Compl.  ¶ 49; Newbridge Am. Compl. ¶ 49.

II.    *Administrative Proceeding*

On February 23, 2009, U.S. Mortgage filed a voluntary petition for relief under chapter

11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of New Jersey.  Pet., *In*

*re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Feb. 23, 2009), ECF No. 1. On April 1, 2009,

CU National filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pet.,

*In re CU Nat'l Mortg. LLC*, No. 09-18104 (Bankr. D.N.J. Apr. 1, 2009), ECF No. 1.  By Order

of this Court, the chapter 11 cases of the Debtors were administratively consolidated. Order

Directing Joint Admin. of Debtors' Chapter 11 Cases, *In re U.S. Mortg. Corp.*, No. 09-14301

(Bankr. D.N.J. Apr. 13, 2009), ECF No. 107.

On March 13, 2009, the U.S. Trustee appointed the Unsecured Creditors' Committee pursuant to 11 U.S.C. § 1102(a)(1). Appt. of Unsecured Creditors' Comm., *In re U.S. Mortg. Corp.*, No. 01-14301 (Bankr. D.N.J. Mar. 13, 2009), ECF No. 66.

The Debtors' Third Amended Joint Plan of Liquidation was confirmed by this Court on October 26, 2009. Order Confirming Debtors' 3d Am. Joint Plan of Liquid., *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Oct. 26, 2009), ECF No. 563. The cases were substantively consolidated for post-confirmation purposes by order of this Court, effective October 26, 2009. Order Authorizing Substantive Consol. of Debtors' Bankr. Estates for Post-Confirm. Purposes *Nunc Pro Tunc* to Oct. 26, 2009, *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Dec. 22, 2009), ECF No. 591. Pursuant to the provisions of the Confirmation Order, *id.* ¶ 16, Anthony R. Calascibetta was appointed Liquidating Trustee by the Official Committee of Unsecured Creditors. Notice of Appt. of Liquidating Tr., *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Nov. 20, 2009), ECF No. 592. On February 1, 2012, the Post-Confirmation Committee of Unsecured Creditors appointed Edward P. Bond, CPA, as the Substitute Liquidating Trustee ("Trustee"). Notice of Appt. of Substitute Liquidating Tr., *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Feb. 1, 2012), ECF No. 967.

III.   *Trustee's Adversary Proceedings*

On February 22, 2011, the Trustee filed nine substantially similar adversary complaints against financial institutions and broker-dealers including the matters presently before this Court.

A. *Newbridge Securities Corp.*

Newbridge is a Florida corporation, Am. Compl. ¶ 5, and it is a securities broker-dealer and member of FINRA and SIPC, Newbridge Mot. to Dismiss ¶ 4.

In the Amended Complaint, the Trustee alleges that the relationship between Newbridge and McGrath was such that Newbridge was aware of the various schemes McGrath perpetuated. According to the Trustee, as part of the investment scheme, McGrath invested funds belonging to the Debtors with the Defendant, and the Defendant, accordingly, provided services to the Debtors and McGrath including assisting with the purchase and sale of security instruments. Am. Compl. ¶¶ 47-48. Trustee identifies an employee of Newbridge, John Slipek, as having the primary relationship with McGrath and alleges that Slipek and McGrath "knew each other well enough that, when Slipek would change brokerage firms, McGrath would follow him." Am. Compl. ¶¶ 49-50. Further, according to the Trustee, at all relevant times, McGrath was taking high doses of the drug Xanex, and not only was the Defendant's agent aware of McGrath's drug use, but also provided McGrath with the drug at times. *Id.* ¶¶ 51-53.

The Amended Complaint also alleges "at all relevant times, the Debtors and/or McGrath delegated discretionary trading authority to the Defendants." *Id.* ¶ 54. Further, the Trustee alleges, the Defendant owed a fiduciary duty to the Debtors and made significant commissions from the Debtors' and/or McGrath's trades. *Id.* ¶ 54-56. The Trustee identifies several "Transfers" which, it asserts, were used to "purchase securities, to reimburse the Defendant for securities previously purchased, or to pay the Defendant commissions." *Id.* ¶ 58. These Transfers from the Debtors were received by Newbridge on October 28, 2008 and were in an amount not less than $1 million. *Id.* ¶ 57. Other transfers in an amount not yet know by the Trustee were also received. *Id.*

The Trustee alleges that Newbridge and its agents intentionally disregarded facts that would have demonstrated that the Newbridge Transfers were fraudulent and unauthorized, and

[8]

therefore Newbridge, "through its agents, knowingly assisted McGrath in the fraudulent diversion and use of the Debtors' assets." *Id.* ¶¶ 59-61.

According to Newbridge, since October 2007, it has used Legent Clearing LLC ("Legent") as its clearing house. Newbridge Mot. to Dismiss ¶ 4 (citing Buddie Aff. ¶ 2). Pursuant to that arrangement, Legent ("Clearing Broker") and Newbridge entered into a clearing agreement in or about August 9, 2007 ("Newbridge-Legent Clearing Agreement"). *Id.* ¶ 5. The Newbridge-Legent Clearing Agreement, which remains in effect, contains operating procedures which require all transfers of funds from and to Newbridge customers are to be paid to Legent. Thus, according to Newbridge, Legent is the recipient and intended beneficiary of all payments from Newbridge customers. *Id.* In fact, the Clearing Agreement states: "each Customer is directly responsible to Clearing Broker with respect to payment for all securities purchased, and for the delivery of all securities sold, for his or her account . . . ." Newbridge-Legent Clearing Agreement § 3.5.

Newbridge characterizes the relationship between itself and McGrath as a straightforward, typical customer-broker dealer relationship. According to Newbridge, McGrath was a brokerage customer of Newbridge, and as such, prior to the Petition Date, McGrath caused at least three brokerage accounts to be opened: one in the name of McGrath individually and two in the names of McGrath and his wife, Susan McGrath. Newbridge Mot. to Dismiss ¶ 6. In or about March 2008, Newbridge asserts that one account, in the name of U.S. Mortgage Corp., Attention Michael J. McGrath," ("U.S. Mortgage Account") was opened at Newbridge, and that account was subsequently closed on July 10, 2009. During the time the U.S. Mortgage Account was open, the only activity occurred in March 2008. *Id.* ¶ 7. Newbridge asserts that CU was

[9]

never a customer of it, nor had an account at Newbridge, made no transfers to it nor conducted business with it. See Buddie Aff., ¶¶ 8-15.

On February 22, 2011 the Trustee filed this Adversary Proceeding against Newbridge.

On June 2, 2011, the Trustee filed an Amended Complaint to Avoid and Recovery Transfers ("Newbridge Amended Complaint"). Newbridge Am. Compl., ECF No. 3. The Newbridge Amended Complaint contains six counts against Newbridge. Count I, Accounting, asserts the Trustee is entitled to an accounting from Newbridge of all funds received by it from the Debtors and the allocation of such funds. Id. ¶ 63.

Count II, Intentional Fraudulent Transfer, asserts the Trustee is entitled to judgment avoiding the Newbridge Transfers, pursuant to 11 U.S.C. § 548(a)(1)(A)—for transfers made within one year [sic] of the Petition Date—and N.J.S.A. 25:2-25a, 2-29, and 2-30; for recovery in the amount of all the Transfers, pursuant to 11 U.S.C. § 550(a); and for fees and costs. The Trustee alleges that within four years of the Petition Date, Newbridge received the Newbridge Transfers in an amount not less than $1 million and other transfers not now known to the Trustee and that the Transfers were made with the actual intent to hinder, delay or defraud creditors of the Debtors. Id. ¶¶64-69.

Count III, Constructive Fraudulent Transfer, asserts the Trustee is entitled to judgment avoiding the Newbridge Transfers, pursuant to 11 U.S.C. § 548(a)(1)(B)—for transfers made within one year [sic] of the Petition Date—and N.J.S.A. 25:2-25b, 2:27a, 2-29, and 2-30; for recovery in the amount of all the Transfers, pursuant to 11 U.S.C. § 550(a); and for fees and costs. Id. ¶¶ 76-77. The basis for the relief is the Debtors received less than a reasonably equivalent value in exchange for the Newbridge Transfers because of McGrath's massive fraud to, inter alia, sell credit union loans to finance U.S. Mortgage's operations and engage in the

investment scheme. Further, the Complaint alleges, on the dates of the Newbridge Transfers, the Debtors were insolvent, were engaged in a business or transaction for which any property remaining with the Debtors was unreasonably small capital, and the Debtors and McGrath intended to incur—or believed the Debtors would incur—debts that would be beyond the Debtors' ability to pay as the debts matured and that there exists at least one creditor whose claim against the Debtors arose prior to the date of each Transfer. *Id.* ¶¶ 71-75.

Count IV, Civil Conspiracy, asserts the Trustee is entitled to judgment for actual damages to be proven at trial pursuant to applicable nonbankruptcy law; for the amount of the Debtors' funds used by McGrath to purchase securities from Newbridge, pursuant to 11 U.S.C. § 544, and for fees and costs. *Id.* ¶¶ 79, 82. The Amended Complaint alleges McGrath fraudulently deprived Debtors of funds and used those funds to purchase securities from Newbridge in his own name or the names of entities he owned and/or controlled; Newbridge acted in concert with McGrath in so fraudulently depriving the Debtors; and that as a direct and proximate result, the Debtors were damaged. *Id.* ¶¶ 79-81.

Count V, Aiding and Abetting Civil Conspiracy and Fraud, asserts the Trustee is entitled to judgment against the Defendant for: (a) actual damages to be proven at trial pursuant to applicable nonbankruptcy law; (b) for the amount of the Debtors' funds used by McGrath to purchase securities from Newbridge, pursuant to 11 U.S.C. § 544; and (c) for fees and costs. *Id.* ¶ 89. The Amended Complaint alleges Newbridge: acted in concert with McGrath to fraudulently deprive the Debtors of title to their property; had actual knowledge of the fraudulent deprivation; provided substantial assistance in furtherance of McGrath's scheme; and intentionally disregarded facts "available and known to it" from which it would have known

about the fraud and its role in the commission thereof, so that as a proximate result of those

actions, the Debtors suffered harm. *Id.* ¶¶ 84-88.

Count VI, Conversion, asserts the Trustee is entitled to judgment against Newbridge for

the amount of the property converted by McGrath pursuant to 11 U.S.C. § 550 and applicable

nonbankruptcy law and for fees and costs. *Id.* ¶ 95. The Trustee alleges the Debtors had a right

to retain the funds transferred by McGrath in furtherance of his investment scheme, but that

through fraud, McGrath converted those funds for his own benefit and for the benefit of entities

he owned and/or controlled. Further, the Amended Complaint asserts Newbridge asserted

dominion and control over the Debtors' property and that as a direct and proximate result, the

Debtors sustained damages. *Id.* ¶¶ 89-94.[1]

B. *Vining Sparks*

On February 22, 2011, Anthony Calascibetta, then the Liquidating Trustee ("Trustee"),

filed the instant Complaint ("Original Complaint") against Vining Sparks. In the Original

Complaint, the Trustee alleges that prior to the Petition Date, Vining Sparks "provided services

to Michael McGrath, ["U.S. Mortgage"] and/or an entity owned and/or controlled by McGrath."

Compl. ¶ 10. The information provided in the Original Complaint about these services and the

related compensation is that "[d]uring the period between February 25, 2005 and December 15,

2008, the Debtors made payments to the Defendant which totaled $4,602,464 and other transfers

in an amount not known to the Trustee," *id.* ¶ 13, and that the Trustee believed "the payments

made by the Debtors to [Vining Sparks] were used to purchase securities, to reimburse the

Defendant for securities previously purchased, or to pay the Defendant commissions on behalf of

one or more of [McGrath, U.S. Mortgage, or other related entities]," *id.* ¶ 14. Further, the

Trustee alleges that during the period the services were provided, McGrath and U.S. Mortgage

---

[1] This count cites to § 550, rather than § 544 as the statutory basis for the state law claim.

"delegated discretionary trading authority" to Vining Sparks, which allegedly "owed a fiduciary duty to the Debtors." *Id.* ¶¶ 11-12. The Trustee argues that the Debtors did not receive equivalent value or fair consideration in exchange for the transfers, and that the Defendant "intentionally disregarded facts that informed the Defendant and its agents that the Transfers by the Debtors to the Defendant were fraudulent and unauthorized" and that the Defendant, through its agents, knowingly assisted McGrath in the fraudulent diversion and use of the Debtors' assets and knowingly and/or intentionally aided and abetted McGrath in the breach of his fiduciary duty to the Debtors." *Id.* ¶¶ 15-16.

The Original Complaint asserts six counts against Vining Sparks. Count I, Accounting, seeks a judgment for an accounting of all funds received by Vining Sparks from the Debtors and the allocation of such funds. *Id.* ¶¶ 20-21. Count II, Avoidance and Recovery of Preferential Transfers, seeks judgment pursuant to 11 U.S.C. §§ 547 and 550 for the avoidance and recovery of the $417,986.75 known by the Trustee to have been received by Vining Sparks in the ninety days pre-petition, as well as any amounts received by Vining Sparks during that period as yet unknown to the Trustee. *Id.* ¶¶ 22-29. Count III, Fraudulent Transfers, seeks judgment pursuant to 11 U.S.C. §§ 544, 548(a)(1), and 550, as well as N.J.S.A. 25:2-25 et seq., for the avoidance and recovery of transfers to Vining Sparks from Debtors, because, the Trustee alleges, the transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtors, the Debtors received less than a reasonable equivalent value in exchange for the Transfers, the Debtors were insolvent at the time of the Transfers or became insolvent as a result thereof, and/or the Debtors were engaged in a transaction or were about to engage in a transaction for which property remaining with the Debtors was an unreasonably small capital and/or the Debtors included to incur or believed they would incur debts that would be beyond their ability to pay as

[13]

same matured.    Count IV, Civil Conspiracy, seeks judgment pursuant to applicable non-bankruptcy law and 11 U.S.C. §§ 544 and 550 for damages and avoidance and recovery of the transferred property because, the Trustee alleges, Vining Sparks acted in concert with McGrath to fraudulently deprive Debtors of title to the property. *Id.* ¶¶ 37-41.    Count V, Aiding and Abetting Civil Conspiracy & Fraud, seeks judgment pursuant to applicable non-bankruptcy law and 11 U.S.C. § 544 and 550 for damages and avoidance and recovery of the transferred property because, the Trustee alleges, Vining Sparks "intentionally disregarded facts available and known to it from which [it] would have known of the fraud" and as a direct and proximate result, the Debtors suffered injury. *Id.* ¶¶ 42-48.

Finally, Count VI, Conversion, seeks judgment pursuant to applicable non-bankruptcy law and 11 U.S.C. §§ 544 and 550 for damages and avoidance and recovery of the transferred property because, the Trustee alleges, Vining Sparks unlawfully received property converted by McGrath. *Id.* ¶¶ 49-55.

IV.    *Instant Motions to Dismiss*

A. Newbridge

On August 24, 2011, Newbridge filed the instant Motion for an Order Dismissing the Adversary Proceeding pursuant to Fed. R. Bankr. P. 7012, 7008 and 7009, Fed. R. Civ. P. 12(b)(6), 8(a), 9(b) made applicable by the Federal Rules of Bankruptcy Procedure 7012, 7008 and 7009 and 11 U.S.C. § 546(e) ("Newbridge Motion to Dismiss").    Newbridge Mot. to Dismiss, *Bond v. Newbridge Secs. Corp.*, No. 11-1218 (Bankr. D.N.J. Aug. 24, 2011), ECF No. 14.    The Newbridge Motion to Dismiss seeks an order dismissing the Adversary Proceeding with prejudice for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), upon eight independent grounds. *Id.* ¶ 11.

First, the Newbridge Motion to Dismiss argues that Count I, Accounting, must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because the Trustee has no legal or factual basis to demand an accounting. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. of L. in Supp. of Mot. to Dismiss 4, *Bond v. Newbridge Secs. Corp.*, No. 11-1218 (Bankr. D.NJ. Aug. 24, 2011), ECF No. 14-1 ("Newbridge Mem. in Supp."). In support, Newbridge looks to the Bankruptcy Code, which it argues only entitles a trustee to an accounting where there is a custodian. Newbridge Mem. in Supp. at 8 (citing 11 U.S.C. § 543(b)). Because Newbridge "is not a custodian and is not alleged to be a custodian," it argues that § 543(b) does not apply and therefore the Trustee is not entitled to an accounting. *Id.*

Second, the Amended Complaint argues Counts II and III, Intentional and Constructive Fraudulent Transfer respectively, must be dismissed under Rule 12(b)(6) because Newbridge is not a "transferee" from whom recovery can be obtained under 11 U.S.C. § 550(a) as a matter of law. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 4-5. Newbridge argues that the Trustee "fails to furnish any factual support for the naked assertion that the Debtors made the Transfers, or for the naked assertion that Newbridge received the Transfers," and that since the Trustee does not provide any factual detail and does not identify the amounts transferred, the Trustee has failed to meet its burden under the *Twombly* and *Iqbal* pleading standards. Newbridge Mem. in Supp. at 9. Additionally, Newbridge argues, the Court should not accept the Trustee's allegations as true because not only was CU never an account holder with Newbridge, nor was there any activity in the U.S. Mortgage Account with Newbridge except that which occurred in March 2008, over seven months prior to the date of the alleged Transfers, but also Newbridge never received the Transfers nor any payments or transfers of

funds from either of the Debtors, McGrath, or in connection with the McGrath family accounts. *Id.* at 9-10.

Further, Newbridge argues, even assuming *arguendo* the Debtors had made the Transfers and Newbridge received the Transfers, the Trustee has failed to state a cause of action under § 550(a)(1) or (a)(2) because Newbridge is neither an initial transferee nor a subsequent transferee. Newbridge is not an initial transferee within the meaning of § 550(a)(1), it asserts, because in order to be an initial transferee, an entity must have dominion over the money transfer, i.e., the right to put the money to its own use, and here, the Trustee has alleged no facts to support its allegation that Newbridge exercised dominion and control over the Transfers. Newbridge also asserts that it is not an entity for whose benefit the transfers were made under the terms of Section 3.5 of the Clearing Agreement which entitled Legent to receive the benefit of all payments that customers made to purchase securities. Additionally, the Trustee has not alleged that Newbridge was a "subsequent transferee" of any of the transfers under § 550(a)(2).

Third, Newbridge asserts that the safe harbor provision of the Bankruptcy Code, § 546(e), bars Count III, Constructive Fraudulent Transfer under the Bankruptcy Code and New Jersey state law, and therefore that Count must be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 5.

Fourth, Newbridge argues Counts IV, V, and VI—Civil Conspiracy, Aiding and Abetting Civil Conspiracy and Fraud, and Conversion, respectively—must be dismissed under Rule 12(b)(6) pursuant to the *in pari delicto* doctrine, and further argues that defense is warranted here at the motion to dismiss stage. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 5.

Fifth, Newbridge argues that the Trustee does not have standing to assert the claims of creditors in the causes of action in Counts IV, V, and VI. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 5.

Sixth, Count IV, Civil Conspiracy, and part of Count V, Aiding and Abetting Civil Conspiracy, must be dismissed because under New Jersey law, civil conspiracy is not an independent cause of action and the Trustee, according to Newbridge, the Trustee has failed to state a claim for fraud or for any other underlying intentional tort. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 5.

Seventh, Newbridge argues the entire Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 8(a)(2) and 12(b)(6) because the Trustee has failed to plead any of the causes of action with the required level of specificity. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 5.

And eighth, Newbridge argues that Counts II and V, Intentional Fraudulent Transfer and Aiding and Abetting Fraud, should be dismissed pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) because the Trustee has failed to plead fraud with the requisite level of particularity. Newbridge Mot. to Dismiss ¶ 11; Newbridge Mem. in Supp. at 5.

On November 11, 2011, the Trustee submitted a Memorandum of Law in Opposition to Defendant's Motion to Dismiss. Trustee Opp. To Mot. to Dismiss, ECF No. 17. Therein, the Trustee states that on October 28, 2008 the Defendant, Newbridge Securities received a wire transfer from U.S. Mortgage in the amount of $1,000,000.00 and that the transfer made by U.S. Mortgage to Newbridge Securities was used to purchase securities, to reimburse the Defendant for securities previously purchased, or to pay the Defendant's commissions. The Trustee asserts therein that he is only seeking recovery of the aforesaid $1,000,000.00 transfer and can file a

second amended complaint to clarify that fact. The Trustee argues that he has sufficiently alleged the legal elements and facts supporting each of the claims that are the subject of this action and that each of the claims asserted against Newbridge survives as a matter of law. The Trustee makes six main arguments. First, the Trustee asserts that an accounting is warranted because the Defendant owed a fiduciary duty to the Debtors, the accounts in question are complicated, and there is a need for discovery. Second, the Defendant is a transferee from whom recovery can be obtained under 11 U.S.C. 550(a). Third, the safe harbor provision of 11 U.S.C. § 546(e) does not shield the Defendant from the Trustee's claims because the subject transfer from U.S. Mortgage to the Defendant cannot be construed as a "settlement payment." Fourth, the Trustee argues that aside from the fact that *in pari delicto* is a factually intensive affirmative that this Court should not consider on a motion to dismiss, the Defendant's participation in the Debtors' principal's fraud prevents the Defendant from relying on the defense. Fifth, the Trustee has standing to assert claims on behalf of the Debtors' creditors pursuant to the Debtors' Third Amended Joint Plan of Liquidation. Finally, all of the Trustee's claims are plead in accordance with Fed. R. Civ. P. 8(a) and 9(b). Accordingly, the Trustee asks this Court to deny Newbridge's motion in its entirety.

On November 23, 2011, Newbridge filed a Reply to the Trustee's Opposition to Newbridge's Motion to Dismiss. Newbridge argues first that the Trustee has failed to state a claim for accounting because accounting is an equitable remedy and there is an adequate remedy at law. Further, Newbridge asserts that there is no fiduciary relationship between the Debtors and Newbridge. As to the Intentional Fraudulent Transfer claim under § 548(a)(1)(A), Newbridge argues that the Trustee has failed to state a claim against Newbridge under § 550(a) because the transfer was made to Legent and for the benefit of Legent. Newbridge argues that §

546(e) requires dismissal of the claim for Constructive Fraudulent Transfer under the Bankruptcy Code and New Jersey state law because the alleged transfer is a protected settlement payment under § 546(e) and the alleged transfer is a transfer made to or for the benefit of a stockbroker in connection with a "securities contract" as defined in § 741(7). Newbridge argues that Counts IV (Civil Conspiracy) and V (Aiding and Abetting Conspiracy and Fraud) should be dismissed because: (1) Civil Conspiracy is not an independent cause of action; (2) § 546(e) requires dismissal pursuant to the preemption doctrine; and (3) the *in pari delicto* doctrine applies. Newbridge further argues that Count VI (Conversion) should be dismissed because: (1) § 546(e) requires dismissal pursuant to the preemption doctrine; and (2) the *in pari delicto* doctrine applies. Newbridge also asserts that Counts II, IV, V, and VI are not pleaded sufficiently.

B. *Vining Sparks*

On May 16, 2011, Vining Sparks filed the instant Motion to Dismiss Complaint. Mot. to Dismiss, ECF No. 3. Vining Sparks argues that the Complaint should be dismissed on several grounds. First, it argues that Count I, Accounting, is without basis because Vining Sparks owes no fiduciary duty to the Debtors and because the accounting is not complicated and discovery does not require it. Mem. in Supp. of Mot. to Dismiss 1, May 16, 2011, ECF No. 3-1. Second, it argues that to the extent Counts II-VI claim recovery under 11 U.S.C. § 544, the claims are barred by the safe harbor provision of 11 U.S.C. § 546(e). Further, it argues, the transactions at issue occurred between 2005 and 2008, and therefore are outside the applicable statute of limitations. Finally, Vining Sparks argues that the Counts III-VI fail to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and that the entire Complaint fails to meet the standard of Fed. R. Civ. P. 8(a) to state a claim upon which relief can be granted. Mem. in Supp. at 2.

The Motion to Dismiss argues that Vining Sparks is a broker-dealer regulated under the Securities Exchange Act of 1934 and that the transfers at issue related to the settlement of one or more securities trades and are therefore within the safe harbor provision of 11 U.S.C. § 546(e). It asserts the Complaint "openly admits" the transactions at issue were conducted on the securities markets asserting that "payments made by the Debtors to Defendant were used to purchase securities, to reimburse Defendant for securities previously purchased, or to pay Defendant commissions on behalf of one or more of the customers".  Further, Vining Sparks argues, the Trustee is merely parroting the words of the statute and fails to assert any facts, let alone sufficient specificity, to uphold an allegation of actual fraud.  *Id.* at 2-3.  Vining Sparks argues the Trustee is searching "for the proverbial 'deep pocket'" by bringing claims against all securities firms with which the Debtors or McGrath did business without any specific, meaningful factual allegations, and that therefore the Trustee's Complaint is "exactly the type of pleading that Congress sought to bar when it enacted a safe harbor for securities firms." *Id.* at 3.

Vining Sparks argues the Counts I (Accounting), IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud) and VI (Conversion) of the Complaint are based in whole or in part on state law and so are barred by the safe harbor provision of 11 U.S.C. § 546(e) because § 546(e) precludes the maintenance of § 544 claims where the transaction involves the settlement of a securities matter or a transfer to a stockbroker, financial institution, financial participant, or securities clearing agency in connection with a securities contract.  Further, Vining Sparks argues that this Complaint typifies the type of transaction Congress sought to shield from avoidance actions when it enacted § 546(e) because reversals of settled securities transactions could potentially destabilize financial markets.  Vining Sparks concludes that §

546(e) explicitly precludes the maintenance of any § 544 claim here, as the safe harbor granted by § 546(e) contains only one exception, claims under § 548(a)(1)(A).

Vining Sparks argues as well that the fraudulent transfer claim, including that plead under § 548(a)(1)(A), must fail as well. Vining Sparks argues that § 548(a)(1)(A) is inapplicable to this case as the Debtors received "value" that precludes their avoidance under § 548(a). As well, Vining Sparks asserts that (1) Plaintiff has failed to plead the fraud claims with particularity; (2) the vagueness of the pleading renders it impossible to determine whether the claims are timely as the complaint states only that the fraudulent transfers took place during the period February 25, 2005 and December 15, 2008; (3) the civil conspiracy counts are not an independent cause of action under New Jersey law but must have a basis in intentional tort; and (4) no conversion claim is plead under New Jersey law as Defendant did not assert unlawful dominion or control over Debtors' property and the property allegedly converted appears to consist of money, not normally the subject of conversion.

On August 10, 2011, the Trustee filed Opposition to Vining Sparks' Motion to Dismiss. The Trustee requests that the Court consider the facts in the Amended Complaint in ruling on the Motion to Dismiss. ECF No. 5. The Trustee asserts that Bill Thompson ("Thompson") was Vining Sparks' account representative that assisted and advised the Debtors and/or McGrath and "upon information and belief" McGrath and Thompson socialized at corporate events, including "the Masters Golf Tournament and Vining Spark's private charter jet." *Id.* at 9. The Trustee asserts that "at all relevant times," McGrath took very high doses of Xanax that he obtained illegally from the internet. *Id.* Further, the Trustee alleges that Vining Sparks was aware of McGrath's Xanex use because McGrath "frequently discussed it with Thompson." *Id.; see also* Proposed Amended Complaint, ¶¶ 49-52.

The Trustee argues that Count I (Accounting) is warranted because Vining Sparks owed a fiduciary duty to the Debtors, the accounts in question are complicated, and there is a need for discovery. The Trustee further argues that the safe harbor provision of 11 U.S.C. § 546(e) does not apply to Counts II-VI because the subject transfers from the Debtors to Vining Sparks are not "settlement payments" nor are they ordinary transactions. Accordingly, the Trustee asserts that § 546(e) does not shield Vining Sparks from the Trustee's claims. Furthermore, the Trustee asserts that the Trustee's claims are timely and fall within the relevant statutes of limitation. Additionally, the Trustee asserts that he has sufficiently pled the claims in accordance with Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. The Trustee argues that here the Debtors were engaged in a massive fraud and under these circumstances the payments were not "commonly used in the securities trade."

As well the Trustee argues that § 546(e) does not preclude the maintenance of all claims under 11 U.S.C. § 544, such that by its express terms § 546(e) bars the Chapter 7 trustee's utilization of the rights and powers to <u>avoid</u> certain settlement payments. The Trustee urges that he instead is seeking common law damages and equitable remedies and as such in Counts I (Accounting); Count IV (Civil Conspiracy); Count V (Aiding and Abetting Civil Conspiracy and Fraud) and Count VI (Conversion). The Trustee argues that § 546(e) operates to limit a trustee's avoidance power under § 548(a)(1)(B). It does not, however, limit avoidance under § 548(a)(1)(A).

For claims under § 547 and § 548(a)(1)(B), the Trustee urges that regardless of how broadly the term "settlement payments" is construed, § 546(e) does not protect Vining Sparks, as the transfers are the result of the Debtors' massive fraud and thus are not ordinary course transfers under any circumstances. The Trustee argues that precluding the Trustee from avoiding

[22]

the transfers here is contrary to the goals of § 546(e) because it will not undermine, not protect or promote, investor confidence. The Trustee also argues that (1) he has sufficiently stated a claim for fraud under Fed. R. Civ. Pro. 9(b); (2) the Trustee's claims are timely, as while the limitations period for action under § 548(a)(1) is two years prior to the U. S. Mortgage petition date of February 23, 2009, under N.J.S.A. 25:2-31 the limitation period for the Trustee's claims is four years prior to the U.S. Mortgage petition date, or February 23, 2005, so that transfers between February 25, 2005 and December 15, 2008 are timely; (3) the Trustee has stated valid claims for Civil Conspiracy and Aiding and Abetting Civil Conspiracy and Fraud and for Conversion. Finally, the Trustee requests that if the Court finds the Complaint is subject to dismissal, the Court permit a curative amendment. In the Amended Complaint, the Trustee now pleads his claims in Count V (Civil Conspiracy); Count VI (Aiding and Abetting Civil Conspiracy and Fraud); and Count VII (Conversion) as "damage" claims.

V. *Cross-Motion for the Entry of an Order Authorizing the Liquidating Trustee to File an Amended Complaint in the* Bond v. Vining Sparks *matter (No. 11-1212)*

On June 2, 2011, the Liquidating Trustee filed a cross-motion for the entry of an order authorizing the Liquidating Trustee to file an amended complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure in the *Bond v. Vining Sparks* matter. The Trustee argues that Rule 15(a)(2) allows parties to amend its pleading only with the opposing party's written consent or the court's leave, and that the court should "freely grant leave when justice so requires." Cross-Mot. App. for Am. Compl. ¶¶ 8, ECF No. 4-1. The Trustee seeks to file the Amended Complaint to remedy the issues raised in the Motion to Dismiss. *Id.* ¶ 10. The Amended Complaint contains additional factual allegations and clarifies the causes of actions in the Complaint and reflects the Defendant's proper name, Vining Sparks IBG, L.P. *Id.* ¶ 12-13. Notably, the proposed Amended Complaint separates Count III (Fraudulent Transfer) in the

Original Complaint into two separate counts in the proposed Amended Complaint. First is Count

III (Intentional Fraudulent Transfers) under §§ 548(a)(1)(A), 550(a) and 544 and N.J.S.A. 25:2-

25a, 2-29, and 2-30.   The Amended Complaint asserts that within four years of the U.S.

Mortgage Petition Date the Defendants received transfers in an amount not less than

$4,602,464.00 and other transfers not now known to the Trustee.   Second is Count IV

(Constructive Fraudulent Transfers) under §§ 548(a)(1)(B), 550(a), and 544 and N.J.S.A. 25: 2-

25b, 2-27a, 2-29 and 2-30.[2]  Therein, the Trustee asserts that there exists at least one creditor

whose claim against the Debtors arose prior to the date that each of the Transfers were made.  In

the Amended Complaint, the Trustee now pleads his claims in Count V (Civil Conspiracy);

Count VI (Aiding and Abetting Civil Conspiracy and Fraud); and Count VII (Conversion) as

"damage" claims.

On August 11, 2011, Vining Sparks filed a response to the Trustee's cross-motion.  ECF No.

6.  Vining Sparks opposes the cross-motion and Amended Complaint on the same grounds set

forth in Vining Sparks' Memorandum of Law in Support of its Motion to Dismiss, including: (1)

the safe harbor of 11 U.S.C. § 546(e) bars the Trustee's claims; (2) the Complaint fails to plead

fraud with particularity; (3) Trustee's request for an accounting is unwarranted because Vining

Sparks owes no fiduciary duty to the Debtors, the accounting is not complicated, and discovery

does not require it; (4) the Complaint fails to state a claim under Fed. R. Bankr. P. 7012(b)(6)

and 7008; (5) Trustee's state law claims are barred by New Jersey law; and (6) the transactions at

issue occurred between 2005 and 2008, and Trustee's claims are outside the applicable statute of

limitations.  Vining Sparks argues that in addition to the grounds of dismissal set forth in Vining

Sparks' Memorandum of Law, Counts I, V, VI, and VI (Accounting; Civil Conspiracy; Aiding

---

[2] The conversion count of the proposed amended complaint (Count VIII) cites to § 550, rather than § 544 as the
statutory basis for the state law conversion claim.

and Abetting Civil Conspiracy and Fraud; and Conversion) are barred by the *in pari delicto* doctrine. Furthermore, Vining Sparks asserts that the Amended Complaint fails to cure any of the defects set forth in Vining Sparks' Memorandum of Law in Support of its Motion to Dismiss. Vining Sparks requests that the Plaintiff's Cross-Motion be held in abeyance or denied based on the Defendants' Motion to Dismiss.

VI.    *December 1, 2011 Hearing*

On December 1, 2011, this Court heard arguments on Newbridge and Vining Sparks' Motions to Dismiss. Counsel for Newbridge stated that, as conceded by the Trustee, Newbridge is a stockbroker as defined under the Code. Newbridge's counsel asserted that while the mortgage fraud committed by McGrath is undisputed, there is no allegation that Newbridge, a licensed stockbroker, conducted any illegal or unauthorized trading of securities. Accordingly, all causes of action except for the § 548(a)(1)(A) claim are barred by the safe harbor provision of § 546(e) as the transactions constitute payments pursuant to a securities contract and are settlement payments and that the subject transactions do not involve fictitious trades, unregistered securities or other fraudulent schemes that would take the transactions outside the scope of § 546(e). Counsel for Newbridge argued that if the Court maintains the state law actions, it would provide a "run around" the protections of § 546(e) and further argued that the § 548(a)(1)(A) claim (Count II), which is not protected by the safe harbor provision, should nevertheless be dismissed for three other reasons. First, Newbridge is not a "transferee". All transfers went through Legent, Newbridge's clearinghouse. Newbridge only received commissions on trades. Second, Newbridge is a stockbroker, as the Trustee admits. Even if this Court finds that Newbridge received the transfer, Newbridge never had dominion or control over the funds and was merely a custodian. Third, the Trustee has not shown under § 548(a)(1)(A)

[25]

the intent to hinder, delay or defraud creditors. There is no question that McGrath committed

massive mortgage fraud. However, ¶ 40 of the Amended Complaint, which states that McGrath

was using the Debtor's funds and making investments for the purpose of enhancing those

investments in order to cover his operational expenses, does not demonstrate or allege elements

of fraud. Newbridge's counsel asserted that investing funds to try to make money to cover losses

is not fraud. As to the claim for accounting (Count I), counsel stated that there are remedies at

law and there was no fiduciary duty because there was not a discretionary trading account. The

forms that would have to be signed by the customer to make an account discretionary were not

signed in this case. Accordingly, the claim for accounting should be dismissed. As well, counsel

for Newbridge urged that as there are no identifiable funds, the count for Conversion must fail if

not found to be preempted by § 546(e), nor are there grounds for the Civil Conspiracy to Commit

Fraud count. Newbridge urged that *in pari delicto* should apply here to stand as a defense to the

complaint.

Counsel for Vining Sparks joined in the arguments made by counsel for Newbridge as

applicable to Vining Sparks, a broker-dealer, as well. Vining Sparks argues that under § 548(d)

"settlement payments" are for value. Vining Sparks notes that the Trustee acknowledges that

these were payments made to a broker for the purchase of securities. Vining Sparks asserts that

there are no allegations that Vining Sparks participated in or knew of the mortgage fraud and no

securities fraud is alleged here. Vining Sparks asserts that § 546(e) acts as a complete bar to all

actions except for intentional fraud, and that the complaint does not allege that Vining Sparks

participated in the mortgage fraud that McGrath plead guilty to. Counsel argued that the §

546(e) safe harbor provision bars all claims except the § 548(a)(1)(A) claim. As to that claim,

counsel argued that the "good faith transferee" exception applies, as well as the *in pari delicto* defense, and thus the § 548(a)(1)(A) claim should be dismissed as well.

Counsel for the Trustee argued that the massive fraud committed by McGrath takes the transactions outside of the realm of settlement payments that would be protected under § 546(e). Therefore, the safe harbor provision does not apply in the instant matter. The Trustee argued that the "special relationship" between McGrath and certain employees or representatives of the brokers here should take it outside normal broker-client relationship. Further, counsel for the Trustee argued that the safe harbor does not preempt the state law claims because they seek different types of relief, *i.e.* damages to be fixed at trial. As to the claim for Accounting, counsel for the Trustee argued that the Trustee should be able to conduct discovery in order to determine whether a fiduciary relationship existed or not and stated that both Newbridge Securities and Vining Sparks "have greatly minimized the relationship between McGrath and brokers employed by them." The Trustee asserts here that the one subject transfer, while arguably not going directly to Newbridge, was for the benefit of Newbridge, including the commission payment, so that the Motion to Dismiss should fail. The Trustee also urged that the complaint meets Rule 9 standards for specificity as to both Newbridge and Vining Sparks. The Trustee again asserted that Newbridge had discretionary authority over the accounts and that the Trustee should be entitled to further discovery. As to the Conspiracy count, the Trustee urged that the underlying wrong – fraud – was sufficiently plead as required by Rule 9(b).

Vining Sparks also urged that any transfers beyond the two year reach-back period under Code § 548 and Code § 546(a) are barred, while the Trustee relies on the four year reach-back under New Jersey state fraudulent conveyance law.

Newbridge also requested, if appropriate, for the Court to convert its motion to one for summary judgment.

VII.   *March 28, 2013 Conference Call and Supplemental Submissions to the Court*

On March 28, 2013, this Court conducted a conference call with counsel for the Trustee, Newbridge, and Vining Sparks. The Court sought clarification on several points and invited the parties to provide supplemental submissions to the Court on such matters.

On April 5, 2013, counsel for Vining Sparks submitted a supplemental letter to the Court in response to the Court's March 28, 2013 inquiries. In the letter, Vining Sparks advised the Court that there have been no substantive changes in the law since the oral argument at the initial hearing date which would modify the positions asserted by Vining Sparks. Vining Sparks asserted that the safe harbor provision of § 546(e) protects it from the § 544 strong-arm clause under state law. Vining Sparks further asserted that the safe harbor provision of § 546(e) also applies to the § 547 preference actions. Vining Sparks also clarified that it is a "stockbroker" as defined under the Bankruptcy Code in § 101(53A).

On April 12, 2013, counsel for the Trustee submitted a letter in response to Vining Sparks' supplemental submission to the Court. In the letter, the Trustee asserts that § 546(e) does not protect Defendants from the Trustee's state law claims under § 544. Specifically, the Trustee argues that the activities engaged in by McGrath which gave rise to the intentional fraud claims under § 548(a)(1)(A) are the activities which give rise to the claims alleged under state law theories. As such, the Trustee asserts they are not protected by § 546(e). The Trustee cites to *Lehman Bros. Holdings, Inc.*, which states that "[t]he safe harbors necessarily do not extend to the open waters of litigation and are not an impenetrable barrier to other claims against a market participant that has behaved in a manner that may expose the actor to potential liability." 469

B.R. 415, 450 (Bankr. S.D.N.Y. 2012). The Trustee argues that in this case, as in the *Lehman* case, the trustee's claims are grounded in the actual fraudulent intent exhibited by Michael McGrath in carrying out his scheme. The transfers to the defendants were of a kind and nature that took them out of the regular business practices that are not intended to be protected by the "safe harbors" of § 546(e). Accordingly, the Trustee argues that the counts asserting state law claims should not be dismissed. The Trustee does not dispute that Vining Sparks functioned as a broker-dealer, in the same capacity as Newbridge. However, the Trustee does contend that Vining Sparks had a different relationship because its agent Bill Thomson had a "personal relationship with Michael McGrath and was aware of and facilitated McGrath's drug use." The Trustee further advised the Court that he is not aware of any changes in facts or law that would impact the issues being decided by the Court in these motions.

On April 16, 2013, counsel to Vining Sparks submitted a response to Trustee's April 12, 2013 letter to this Court. Vining Sparks argues that the *Lehman* case cited by the Trustee, 469 B.R. 415, has been distinguished in *AP Services LLP v. Silva*, 483 B.R. 63 (S.D.N.Y. 2012). In *AP Services LLP*, the court found that the trustee's state law claims are preempted by § 546(e) if the state law claim "seeks to recover the same payments ... held ... unavoidable under § 546(e)." *AP Services LLP*, 483 B.R. at 72. Vining Sparks cited to additional cases in support of this position. *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009)(dismissing unjust enrichment and illegal and/or excessive shareholder distributions claims because "[a]llowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group*, 274 B.R. 71 (D. Del. 2002); *Securities Investor Protection Corp. v. Bernard L. Madoff Inv. Securities LLC*, 476 B.R.

715, 722-23 (S.D.N.Y. 2012)(the court found that 11 U.S.C. § 546(e) bars a trustee from pursuing claims made under 11 U.S.C. § 548(a)(1)(B) and § 544); *In re Lancelot Investors Fund, L.P.,* 467 B.R. 643 (Bankr. N.D. Ill. 2012)(court granting summary judgment on preferential transfers and constructive fraudulent transfers under 11 U.S.C. §§ 546(e), 547, 548(a)(1)(B), 550 and 544 as well as under Illinois state law); *Picard v. Katz,* 462 B.R. 447 (S.D.N.Y. 2011)(court dismissed claims to avoid payments as preference payments, constructive fraudulent conveyances, and both actual and constructive fraudulent conveyances under New York state law). Vining Sparks argues that in this case, the state law claims asserted by the Trustee in the proposed Amended Complaint mirror the same claims and allegations asserted in Count IV (Constructively Fraudulent Transfers). The state law claims arise out of the same set of facts as the avoidance claims (and preference claim), and seek to effectuate the same objective – the avoidance and recovery of the transfers or the funds used to make the transfers. Accordingly, to allow the Trustee to go forward with its state court claims would frustrate the purpose of § 546(e). Additionally, Vining Sparks refers to the Trustee's acknowledgement that Vining Sparks functioned as a broker-dealer. With regard to any "different relationship" the Trustee asserts exists between Bill Thompson and Mr. McGrath, Vining Sparks argues that the Trustee's previously filed response to the motion to dismiss, complaint and amended complaint fail to meet the pleading requirements under Fed. R. Civ. Pro. Rule 12(b)(6) and 9. Further, Vining Sparks asserts that the Trustee does not provide any factual content that allows the Court to draw any reasonable inference that Vining Sparks is not a stockbroker under § 101(53A).

LEGAL STANDARDS

### *I. Motion to Dismiss Standard*

Federal Rule of Civil Procedure 8(a), made applicable in bankruptcy court by Federal

Rule of Bankruptcy Procedure 7008, requires that a "pleading that states a claim for relief must

contain:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."

Fed. R. Civ. P. 8(a); Fed. R. Bankr. P. 7008.

Parties seeking to dismiss a complaint for failure to state a claim may do so on motion

pursuant to Federal Rule of Civil Procedure 12(b)(6), which is made applicable in bankruptcy

court by Federal Rule of Bankruptcy Procedure 7012. Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P.

7012.

When considering a motion to dismiss, a court must accept all well-pleaded allegations in

the complaint as true, view them in the light most favorable to the plaintiff, and determine

whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). To survive a motion to dismiss,

a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that

is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973

(2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "A claim has facial

plausibility when the pleaded factual content allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.

Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).

The United States Supreme Court has set forth a two-step analysis for adjudicating a motion to dismiss. *Iqbal*, 129 S. Ct. at 1949-50. First, a court should identify and reject labels, conclusory allegations, and formulaic recitation of the elements of a cause of action. Second, a court must draw on its judicial experience and common sense to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief. The court must infer more than the mere possibility of misconduct. *Id.* This does not impose a "probability requirement" at the pleading stage, but requires a showing of "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

In deciding motions to dismiss under Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of the claim. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A court may also take judicial notice of a prior judicial opinion. *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

## *II. § 546(e) "Safe Harbor" Standard*

### *1. Generally*

Section 546(e) of the Bankruptcy Code provides a "safe harbor" by protecting certain types of transfers from avoidance actions. See *Brandt v. B.A. Capital Co., LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009), *cert. denied*, 130 S. Ct. 2389 (2010) (section 546(e) "shields certain settlement payments from a trustee's power to avoid a transfer as fraudulent."). The purpose of § 546 is "to protect the nation's financial markets from the

[32]

instability caused by the reversal of settled securities transactions." *Kaiser Steel Corp. v.*

*Charles Schwab & Co., Inc. (In re Kaiser Steel Corp)*, 913 F.2d 846, 848 (10th Cir. 1990).

> Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) ("Safe Harbor Provision").

Congress enacted this broad prohibition on the avoidance of margin payments and

settlement payments in order to "minimize the displacement caused in the commodities and

securities markets in the event of a major bankruptcy affecting those industries," and "prevent

the insolvency of one commodity or security firm from spreading to other firms and possible

[*sic*] threatening the collapse of the affected market." H.R. Rep. No. 97-420, at 1, *reprinted in*

1982 U.S.C.C.A.N. 583, 583.

   2.  *Settlement Payment*

The term "settlement payment" has a somewhat circular definition. Section 741 of the

Bankruptcy Code defines "settlement payment" as "a preliminary settlement payment, a partial

settlement payment, an interim settlement payment, a settlement payment on account, a final

settlement payment or any other similar payment commonly used in the securities trade." 11

U.S.C. § 741(8).

[33]

The Third Circuit has interpreted the term "settlement payment" very broadly. In *Bevill,*
*Bresler & Schulman Asset Mgmt. Corp. v. Spencer Savings & Loan Ass'n,* 878 F.2d 742 (3d Cir.
1989), the Third Circuit noted that § 546 is at the intersection of "two important national
legislative policies ... on a collision course" - the policies of bankruptcy and securities law.  878
F.2d at 751.  In *Bevill,* the Third Circuit addressed the meaning of "settlement payment" under §
546(f) in a securities transfer under "repo" agreements, but that interpretation of "settlement
payment" is applicable in the context of § 546(e). *See Lowenschuss v. Resorts Int'l, Inc. (In re
Resorts Int'l, Inc.),* 181 F.3d 505, 515 (3d Cir. 1999), *cert. denied,* 120 S. Ct. 531 (1999) (noting
that "[s]ection 546(f) is similar to section 546(e) except that it applies specifically to settlement
payments made 'by or to a repo participant in connection with a repurchase agreement.'")

In *Bevill,* the Third Circuit found that the term "settlement payment" has an "extremely
broad" definition, consistent with Congress's intent. *Id.* at 751.  The court held that a
"'settlement payment' may be the deposit of cash by the purchaser or the deposit or transfer of
the securities by the dealer, and that it includes transfers which are normally regarded as part of
the settlement process, whether they occur on the trade date, the scheduled settlement day, or any
other date in the settlement process for the particular type of transaction at hand." *Id.* at 752.
The Third Circuit further defined the term "settlement payment" in *In re Resorts Int'l, Inc.,* 181
F.3d 505 (3d Cir. 1999).  In that case, the court held that "[i]n the securities industry, a
settlement payment is generally the transfer of cash or securities made to complete a securities
transaction." 181 F.3d at 515 (citing *Kaiser Steel Corp v. Charles Schwab & Co.,* 913 F.2d 846,
849 (10th Cir. 1990)).  The court further held that the term "settlement payment" is a broad one
that "includes almost all securities transactions." *Id.*  This Court notes the definition of
"settlement payment" found in *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.),* 341 B.R. 451

[34]

Case 11-01218-RG   Doc 24   Filed 04/23/13   Entered 04/23/13 16:23:41   Desc Main
                                Document      Page 35 of 65

(Bankr. S.D.N.Y. 2006). In that case, the court held that "[i]n the securities industry, 'any transfer of cash or securities made to complete a securities transaction is considered a settlement payment.'" *Id.* at 456 (citing *Walsh v. The Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.)*, 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001)); *see also Enron Creditors Recovery Corp. v. Alfa*, 651 F.3d 329 (2d Cir. 2011) (holding that early redemption payments of commercial paper are "settlement payments" within the meaning of § 741(8) and thus protected by the safe harbor provision of § 546(e) and that nothing in the text of § 741(8) or the Bankruptcy Code support a purchase or sale requirement).

### 3. *Exceptions to "Safe Harbor" Protection*

There are certain instances where systemic fraud in a case will move a court not to apply the safe harbor provision because such fraud affects whether a transaction properly constitutes a "settlement payment." When systemic fraud is present, the transaction runs afoul of the portion of § 741(8) definition of the term "settlement payment" that includes the phrase "any other similar payment *commonly used* in the securities trade." 11 U.S.C. § 741(8)(emphasis added). Courts have declined to apply § 546(e) in cases typically involving phantom or fictitious securities transactions and transfers that are either illegal or not normally regarded as part of the settlement process. *See In re Grafton Partners*, 321 B.R. 527, 541 (B.A.P. 9th Cir. 2005)(the court declined to apply § 546(e) in a case involving an illegally unregistered security because an illegally unregistered security "can hardly be described as a 'payment commonly used in the securities trade.'"); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 481 (S.D.N.Y. 2001)(the court declined to apply § 546(e) where fictitious securities transaction involved because the payments were "so steeped in fraud" that they were not of the type

"commonly used in the securities trade."); *Wider v. Wootton (In re Wider)*, 907 F.2d 570 (5th

Cir. 1990)(court declined to apply § 546(e) where fictitious securities transaction involved).

    4.   *"Stockbroker" and "Securities Contract" Defined*

      Section 546(e) also applies when a transfer is made by, to or for the benefit of a

stockbroker, securities clearing agent or other referenced entity in connection with a "securities

contract," as defined in § 741(7) of the Bankruptcy Code.

      Section 101(53A) of the Bankruptcy Code provides:

      (53A) The term "stockbroker" means person –

        (A)        with respect to which there is a customer, as defined in section
                    741 of this title; and

        (B)        That is engaged in the business of effecting transactions in
                    securities –

              (i)      for the account of others; or
              (ii)     with members of the general public, from or for such
                      person's own account.

11 U.S.C. § 101(53A).

      Section 741(7) provides:

      (7) "securities contract" –

        (A) means—

            (i) a contract for the purchase, sale, or loan of a security, a
certificate of deposit, a mortgage loan, any interest in a mortgage loan, a
group or index of securities, certificates of deposit, or mortgage loans or
interests therein (including an interest therein or based on the value
thereof), or option on any of the foregoing, including an option to
purchase or sell any such security, certificate of deposit, mortgage loan,
interest, group or index, or option, and including any repurchase or reverse
repurchase transaction on any such security, certificate of deposit,
mortgage loan, interest, group or index, or option (whether or not such
repurchase or reverse repurchase transaction is a "repurchase agreement",
as defined in section 101);
            (ii) any option entered into on a national securities exchange
relating to foreign currencies;

(iii) the guarantee (including by novation) by or to any securities clearing agency of a settlement of cash, securities, certificates of deposit, mortgage loans or interests therein, group or index of securities, or mortgage loans or interests therein (including any interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such settlement is in connection with any agreement or transaction referred to in clauses (i) through (xi));

(iv) any margin loan;

(v) any extension of credit for the clearance or settlement of securities transactions;

(vi) any loan transaction coupled with a securities collar transaction, any prepaid forward securities transaction, or any total return swap transaction coupled with a securities sale transaction;

(vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

(viii) any combination of the agreements or transactions referred to in this subparagraph;

(ix) any option to enter into any agreement or transaction referred to in this subparagraph;

(x) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix); or

(xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant in connection with any agreement or transaction referred to in this subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562; and

(B) does not include any purchase, sale, or repurchase obligation under a participation in a commercial mortgage loan;

5.  *Preemption Doctrine and § 546(e)*

[37]

Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 2,

state laws that interfere with or are contrary to federal law are preempted and without effect.

*Cipollone v. Liggett Group, Inc.* 505 U.S. 504, 516 (1992). State law may be preempted by

federal law either expressly or impliedly. *Orson, Inc. v. Miramax Film Corp.,* 189 F.3d 377,

381-82 (3d Cir. 1999), *cert. denied,* 120 S. Ct. 1286 (2000). In cases where there is no explicit

statutory language preempting state law:

> There are two circumstances where courts will find preemption: (i) conflict
> preemption, where the state law and federal law directly conflict such that the two
> together cannot coexist either because "compliance with both federal and state
> regulations is a physical impossibility" or there is "an inevitable collision between
> the two schemes of regulation."; and (ii) field preemption, where the scheme of
> federal regulation is sufficiently comprehensive to make reasonable the inference
> that Congress "left no room" for supplementary state regulation.

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin.
Group (In re Hechinger Inv. Co. of Del),* 274 B.R. 71, 96 (D. Del. 2002)(citing *Florida Lime &
Avocado Growers, Inc. v. Paul,*373 U.S. 132, 142-43 (1963)); *Orson,* 189 F.3d at 381-82.

In *Hechinger,* an unsecured creditors' committee brought an adversary proceeding raising

claims for fraudulent conveyance, breach of fiduciary duty, unjust enrichment, and equitable

subordination against certain former directors and controlling shareholders of the corporate

debtor as well as certain lenders and investors who financed the leveraged buyout (LBO) of the

debtor. The court first addressed the fraudulent conveyance claim, holding such claim should be

dismissed pursuant to the safe harbor provision § 546(e). *In re Hechinger Inv. Co. of Del.,* 274

B.R. at 89. Next, the court addressed the claim for breach of fiduciary duty and dismissed the

claim as to some defendants but not as to others. *Id.* at 98. Finally, the court addressed the

unjust enrichment claim, finding such claim to be preempted by § 546(e) of the Bankruptcy

Code. *Id.* In arriving at its conclusion regarding preemption of the unjust enrichment claim, the

court found that "the rationales that underlie both conflict and field preemption support a finding

of preemption here." *Id.* at 96. The court further stated:

> The Committee seeks the same remedy under its unjust enrichment claim as that
> sought under its fraudulent transfer claim – to avoid the transactions and recover
> payments that were made in exchange for the tender of Hechinger shares by
> Hechinger shareholders. However, the court has found above that, pursuant to
> section 546(e), the Committee is barred from using its avoidance powers to
> recover payments made to shareholders in the Hechinger LBO transaction.

> If the court were to entertain the Committee's unjust enrichment claim, a claim
> that effectively acts as an avoidance claim against the shareholders in a
> transaction that the court has already found is an unavoidable settlement payment,
> and allowed the Committee to circumvent section 546(e) by asserting a state law
> claim for unjust enrichment based on the same facts and seeking *essentially the*
> *same relief*, the purpose of section 546(e) would be frustrated. Claims that
> Congress deemed unavoidable under sections 544(b) and 546(e) of the
> Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as
> unjust enrichment claims; if they could, the exemption set forth in section 546(e)
> would be rendered useless. Because the Committee's unjust enrichment claim
> effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts
> with the remedial exemption set forth in Code section 546(e). Allowing recovery
> for unjust enrichment here would implicate the same concerns regarding the
> unraveling of settled securities transactions more than one year after settlement,
> which is precisely the result that section 546(e) precludes. Allowing recovery for
> unjust enrichment here would implicate the same concerns regarding the
> unraveling of settlement securities transactions more than one year after the
> settlement, which is precisely the result that section 546(e) precludes.

> Alternatively, the court also finds that the Committee's unjust enrichment claim is
> preempted because the Bankruptcy Code, particularly sections 544 and 546(e),
> provides an exclusive framework for addressing claims that seek to avoid
> transfers made more than one year before bankruptcy. Thus the Code preempts
> the field and precludes supplemental state remedies because the Code alone
> comprehensively addresses such claims.

> The Bankruptcy Code addresses claims that seek to recover payments and
> provides a remedy for such claims. In section 544, it allows a debtor to avoid,
> under certain circumstances, payments that would be avoidable outside of
> bankruptcy by a creditor under state law. But the Code also explicitly limits and
> displaces state law by setting forth federal limits on the use of state law avoidance
> powers under section 544, providing that a settlement payment may not be
> avoided in bankruptcy. 11 U.S.C. § 546(e). By providing and circumscribing the
> remedies for the conduct alleged, Congress necessarily intended to displace
> inconsistent state law claims and remedies.

*Id.* at 96-97 (internal citations omitted) (emphasis added).

Therefore, circumventing the provision of § 546(e) by merely re-labeling avoidance actions but seeking essentially the same relief frustrates the purpose of § 546(e). Thus, common law claims for damages that are merely "re-labeled" avoidance actions are preempted by the Code so as not to render § 546(e) "useless."

In *In re Lehman Brothers Holdings Inc.*, Judge Peck discussed the limits of § 546(e) and preemption of state law claims. 469 B.R. 415 (Bankr. S.D.N.Y. 2012). The Amended Complaint in that case set forth forty-nine separate counts seeking relief on multiple theories. *Id.* at 434. The court held that the "safe harbor" provision did not foreclose unjust enrichment, constructive trust, breach of implied covenant of good faith and fair dealing, conversion, and other such claims. The court explained:

> The safe harbors are not all encompassing and do not offer "fail safe" protection against every cognizable claim made in relation to transactions that may fit within the statutory framework. The safe harbors necessarily do not extend to the open waters of litigation and are not an impenetrable barrier to other claims against a market participant that has behaved in a manner that may expose the actor to potential liability. In sum, these important protections do not grant complete immunity from every conceivable claim made by Plaintiffs.

*Id.* at 450.

Defendants in the *Lehman* case argued that the safe harbor provision of § 546(e), as federal bankruptcy law, preempts certain of the Plaintiffs' unjust enrichment and conversion claims, citing *Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.)*, 564 F.3d 981 (8th Cir. 2009) and *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)* 274 B.R. 71 (D. Del. 2002) in support of such argument. *Id.* at 451. The *Lehman* court distinguished those cases from the matter before it, stating:

> In both of these cases, however, the unjust enrichment claims were identical to the plaintiffs' constructively fraudulent transfer claims under the Bankruptcy Code and also were based upon the same facts as these constructive fraud claims. This litigation is different. The claims that [Defendant] argues should be preempted by federal bankruptcy law are unlike classic avoidance claims for constructively fraudulent transfers. Instead, these claims have more in common with claims grounded in actual fraudulent intent. These claims are not to be treated as replicas of claims to recover constructively fraudulent transfers...

*Id.* at 451 (internal citations omitted).

The court further elaborated that the claims Defendant argued should be preempted were not based on the same facts or nor did they seek the same relief as the claims protected by § 546(e). The court held that state law claims based on "facts that are entirely distinct" from those necessary to state a claim for the kinds of constructively fraudulent transfer under §§ 544 or 548 that are protected by the safe harbor of § 546(e) "should not be wiped out by the safe harbors." *Id.* at 459.

The *Lehman* case has been distinguished in *AP Services LLP v. Silva,* 483 B.R. 63 (S.D.N.Y. 2012). In *AP Services LLP,* the court found that the trustee's claim for unjust enrichment was preempted by § 546(e) because that claim "seeks to recover the same payments ... held ... unavoidable under § 546(e)." *AP Services LLP,* 483 B.R. at 71. However, the court held that claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty were not preempted by the safe harbor provision of § 546(e) because such claims seek money damages, and "[p]ayment of money damages would not implicate the danger against which Section 546(e) is intended to protect – unwinding settled securities transactions." *Id. at 72; see also Contemporary Indus. Corp. v. Frost,* 564 F.3d 981, 988 (8th Cir. 2009)(dismissing unjust enrichment and illegal and/or excessive shareholder distributions claims because "[a]llowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."); *Securities Investor Protection Corp. v. Bernard L.*

*Madoff Inv. Securities LLC,* 476 B.R. 715, 722-23 (S.D.N.Y. 2012)(finding that § 546(e) bars a

trustee from pursuing claims made under 11 U.S.C. § 548(a)(1)(B) and § 544); *Picard v. Katz,*

462 B.R. 447, 453 (S.D.N.Y. 2011)(court dismissed claims to avoid payments as preference

payments, constructive fraudulent conveyances, and both actual and constructive fraudulent

conveyances under New York state law).

### III. Good Faith Transferee and § 548(c)

Section 548(a)(1)(A) does not fall within the purview of the safe harbor provision of §

546(e). Section 548(a)(1)(A) governs intentional fraudulent transfers and permits the avoidance

of a transfer where the debtor "made such transfer or incurred such obligation with actual intent

to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date

that such transfer was made or such obligation was incurred, indebted…" 11 U.S.C. §

548(a)(1)(A). However, § 548(c) provides that a transferee or obligee of a fraudulent transfer or

obligation who takes for value and in good faith may retain the interest transferred or the

obligation incurred. That section states:

> Except to the extent that a transfer or obligation voidable under this section is voidable
> under section 544, 545, or 547 of this title, a transferee or oblige of such a transfer or
> obligation that takes for value and in good faith has a lien on or may retain any interest
> transferred or may enforce any obligation incurred, as the case may be, to the extent that
> such transferee or oblige gave value to the debtor in exchange for such transfer or
> obligation.

11 U.S.C. § 548(c). The statute further provides, in subsection (d)(2)(B):

> A commodity broker, forward contract merchant, stockbroker, financial institution,
> financial participant, or securities clearing agency that receives a margin payment, as
> defined in section 101, 741, or 761 of this title, or settlement payment as defined in
> section 101 or 741 of this title, *takes for value to the extent of such payment…*

11 U.S.C. § 548(d)(2)(B)(emphasis added). Section 741 of the Bankruptcy Code defines

"settlement payment" as "a preliminary settlement payment, a partial settlement payment, an

interim settlement payment, a settlement payment on account, a final settlement payment *or any*

*other similar payment commonly used in the securities trade.*" 11 U.S.C. § 741(8) (emphasis

added). The Third Circuit has found that the term "settlement payment" should be interpreted

broadly and has held that "[i]n the securities industry, a settlement payment is generally the

transfer of cash or securities made to complete a securities transaction." *In re Resorts Int'l, Inc.,*

181 F.3d 505, 515 (3d Cir. 1999). For a more in depth discussion of "settlement payments,"

refer to *Legal Standard* at II.2.

### *IV. Timeliness of Claims*

Section 548(a)(1)(A), which does not fall within the purview of the safe harbor provision

of § 546(e), expressly requires that avoidable transfers be made within two years before the

petition date. Section 548(a)(1)(A) states:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the
> benefit of an insider under an employment contract) of an interest of the debtor in
> property, or any obligation (including any obligation to or for the benefit of an
> insider under an employment contract) incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily --
>
> > (A) made such transfer or incurred such obligation with actual intent to
> > hinder, delay, or defraud any entity to which the debtor was or
> > became, on or after the date that such transfer was made or such
> > obligation was incurred, indebted...

11 U.S.C. § 548(a)(1)(A).

Section 546(a) provides:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not
be commenced after the earlier of--

> (1) the later of--
>
> > (A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

Under N.J.S.A. 25:2-31, claims stated pursuant to N.J.S.A. 25:2-25 *et seq.* have varying statute of limitations periods. N.J.S.A. 25:2-31 states:

A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:

a. Under subsection a. of R.S.25:2-25, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant;

b. Under subsection b. of R.S.25:2-25 or subsection a. of R.S.25:2-27, within four years after the transfer was made or the obligation was incurred; or

c. Under subsection b. of R.S.25:2-27, within one year after the transfer was made or the obligation was incurred.

N.J.S.A. 25:2-31.

### *V. Accounting Standard*

As a threshold matter, an accounting is an equitable remedy. In order to be entitled to an equitable remedy, it must be shown that there is no adequate remedy at law. *See Rainbow Apparel, Inc. v. KCC Trading, Inc.,* 2010 U.S. Dist. LEXIS 51664, at *18-19 (D.N.J. May 26, 2010) (citing *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478 (1962)("'The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is [ ] the absence of an adequate remedy at law.'")).

Once it has been shown that there is no adequate remedy at law, the court will look to whether a claim for accounting has been established. Under New Jersey law, "[a]n accounting in

equity cannot be demanded as a matter of right or of course. The exercise of the equitable

jurisdiction to compel an account rests upon three grounds." *Borough of Kenilworth v.

Graceland Memorial Park Ass'n*, 199 A. 716, 717 (N.J. Ch. Div. 1938). The party seeking to

obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated

nature of the character of the account; and (3) the need of discovery. *Id.*

Whether a fiduciary relationship exists between a broker and a client is dependent on

whether the broker's trading authority is discretionary or non-discretionary. *See, e.g.,*

*Lautenberg Found. v. Madoff*, 2009 WL 2928913, at *15 (D.N.J. Sept., 9, 2009)(Under "New

Jersey law, a fiduciary duty exists between a broker and a client 'where the customer has

delegated discretionary trading authority to the broker.'"), *overruled on other grounds by*

*Belmont v. MB Inv. Partners, Inc.*, 2013 WL 646344, *7 (3d Cir. 2013); *McAdam v. Dean Witter*

*Reynolds, Inc.*, 896 F.2d 750, 767 (3d Cir. 1990)(holding that "at least when the client maintains

a discretionary account with a stockbroker, the broker is in a fiduciary relationship with that

client."); *Goodman v. Goldman, Sachs & Co.*, 2010 U.S. Dist. LEXIS 132593 (D.N.J. Dec. 14,

2010) ("New Jersey law, in accordance with the law of most states, holds that there is no

fiduciary relationship between an investor and a broker where the investor maintains a non-

discretionary account with the broker, *i.e.*, an account over which the investor maintains control

over the investment decisions.").

### *VI. § 550(a) Standard*

#### *1. Generally*

Section 550(a) of the Bankruptcy Code governs the liability of the transferee of an

avoided transfer. Section 550(a) states:

(a) Except as otherwise provided in this section, to the extent that a transfer is
avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title,

the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

### 2. "Initial Transferee"

The term "initial transferee" is not defined in the Bankruptcy Code. *In re Parcel Consultants, Inc.,* 287 B.R. 41, 46 (Bankr. D.N.J. 2002). However, in *In re Parcel Consultants, Inc.,* the court considered the meaning of "transferee" for purposes of § 550 and held:

[I]n order to be a "transferee" of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else.

287 B.R. 41, 46 (Bankr. D.N.J. 2002).

In defining the terms "dominion and control," courts have held that "a transferee must have the legal right to use the funds to whatever purpose he or she wishes, be it to invest in 'lottery tickets or uranium stocks.'" *In re Parcel Consultants, Inc.,* 287 B.R. at 46 (citing *In re Anton Noll, Inc.,* 277 B.R. 875, 879 (1st Cir. B.A.P. 2002)); *see also Bonded Financial Service, Inc. v. European American Bank,* 838 F.2d 890, 893 (7th Cir. 1988)("Although the Bankruptcy Code does not define 'transferee', and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.").

### 3. "Entity for Whose Benefit Such Transfer Was Made"

In the seminal decision of the Seventh Circuit Court of Appeals, *Bonded Financial Service, Inc. v. European American Bank,* the Seventh Circuit held:

[46]

[A] subsequent transferee cannot be the "entity for whose benefit" the initial transfer was made. The structure of the statute separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate transferee[s]", on the other. The implication is that the "entity for whose benefit" is different from a transferee, "immediate" or otherwise. The paradigm "entity for whose benefit such transfer was made" is a guarantor or debtor-someone who receives the benefit but not the money.

838 F.2d 890, 895 (7th Cir. 1988)).

The *Bonded* court further held that "[s]omeone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Id.*

The *Bonded* court also determined that based on the "inference from the structure" of § 550(a), the section "distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property." *Id.* In other words, "the categories 'transferee' and 'entity for whose benefit such transfer was made' are mutually exclusive..." *Id.* This holding was adopted by the United States District for the District of New Jersey in *YA Global Inv., L.P. v. Global Outreach, S.A.,* 2011 U.S. Dist. LEXIS 65106 (D.N.J. June 6, 2011) *aff'd* 2013 U.S. Dist. LEXIS 47652 (D.N.J. Mar. 28, 2013). In that case, the District Court analyzed whether § 550(a)(1) and § 550(a)(2) are mutually exclusive, holding "[t]he Court thus agrees with the Seventh Circuit in *Bonded*, and the weight of authority following that decision, that the categories in subsections (a)(1) and (a)(2) are mutually exclusive." *Id.* at *32.

## VII. Fed. R. Civ. P. 15(a)(2) "Amended Complaint" Standard

Pleading amendments are governed by Fed. R. Civ. P. 15, made applicable to bankruptcy proceedings by Bankruptcy Rule 7015. Rule 15(a) of the Federal Rules of Civil Procedure

permits a party to amend a pleading "once as a matter of course at any time before a responsive

pleading is served." However, after amending once or after an answer has been filed, the

plaintiff may amend only with leave of court or the written consent of the opposing party, but

"leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).

The Supreme Court articulated the standard for Fed. R. Civ. P. 15(a)(2) in *Foman v.*

*Davis.* In that case, the Supreme Court stated:

> In the absence of any apparent or declared reason – such as undue delay, bad faith
> or dilatory motive on the part of the movant, repeated failure to cure deficiencies
> by amendments previously allowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of amendment, etc. – the leave
> sought should, as the rules require, be "freely given."

371 U.S. 178, 182 (1962); *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410,

1434 (3d Cir. 1997)("Among the grounds that could justify a denial of leave to amend are undue

delay, bad faith, dilatory motive, prejudice, and futility."). The Supreme Court further held that

"the grant or denial of an opportunity to amend is within the discretion of the District Court, but

outright refusal to grant the leave without any justifying reason appearing for the denial is not an

exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the

Federal Rules." *Id.*

The Third Circuit has held that if a claim is vulnerable to dismissal under Rule 12(b)(6)

and the plaintiff moves to amend, "leave to amend generally must be granted unless the

amendment would not cure the deficiency." *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir. 2000).

ANALYSIS

**I.     *Newbridge Securities' Motion to Dismiss***

**A.   *Applicability of the § 546(e) Safe Harbor Provision***

This Court finds that the safe harbor provision of § 546(e) mandates dismissal as to Counts II

(state law claims to avoid intentional fraudulent transfers pursuant to the Trustee's strong-arm

powers under § 544 only), III (Constructive Fraudulent Transfers), IV (Civil Conspiracy), V

(Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion). This Court reaches

such conclusion for three reasons. First, the Transfers fall within the meaning of "settlement

payments" as defined by the Bankruptcy Code and Third Circuit case law. Second, § 546(e) also

applies when a transfer is made by, to or for the benefit of a stockbroker, securities clearing

agent or other referenced entity in connection with a "securities contract," and the Trustee has

conceded in his Memorandum of Law in Opposition to Newbridge Securities' Motion to Dismiss

that Newbridge Securities is a stockbroker and that the Transfers were made in connection with a

securities contract. *See Opp.* at 16, ECF No. 17. Further, this Court holds that § 546(e) bars the

assertion of the state common law claims in Counts IV, V, and VI pursuant to the Preemption

Doctrine. Labeling these actions as state common law claims for damages cannot circumvent the

provisions of § 546(e).

     *1.  Settlement Payments*

     Section 741 of the Bankruptcy Code defines "settlement payment" as "a preliminary

settlement payment, a partial settlement payment, an interim settlement payment, a settlement

payment on account, a final settlement payment or *any other similar payment commonly used in*

*the securities trade*." 11 U.S.C. § 741(8) (emphasis added).

     The Third Circuit, in *In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), further defined

the term "settlement payment." In that case, the court held that "[i]n the securities industry, a

settlement payment is generally the transfer of cash or securities made to complete a securities

transaction." 181 F.3d at 515 (citing *Kaiser Steel Corp v. Charles Schwab & Co.*, 913 F.2d 846,

849 (10th Cir. 1990)). The court further held that the term "settlement payment" is a broad one that "includes almost all securities transactions. " *Id.*

The Complaint itself alleges that the "Transfers made by the Debtors to the Defendant [Newbridge Securities] were used to purchase securities, to reimburse the Defendant for securities previously purchased, or to pay the Defendant commissions." Am. Compl. at ¶ 58. Thus, even the Trustee admits in the Amended Complaint that the Transfers at issue were made to complete securities transactions. Accordingly, the Transfers constitute settlement payments under Third Circuit case law. *See In re Resorts Int'l, Inc.,* 181 F.3d 505, 515 (3d Cir. 1999).

Further, this Court finds that the exception to whether a transfer constitutes a "settlement payment" does not apply in the instant matter. The Trustee urged this Court to apply the holdings of *In re Grafton Partners*, 321 B.R. 527 (B.A.P. 9th Cir. 2005), *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406 (S.D.N.Y. 2001), and *Wider v. Wootton* (*In re Wider*), 907 F.2d 570 (5th Cir. 1990). In those cases, the courts declined to apply § 546(e) in cases involving phantom or fictitious securities transactions and transfers that are either illegal or not normally regarded as part of the settlement process. The rationale behind such holdings is that systemic fraud affects whether a transaction properly constitutes a "settlement payment." When systemic fraud is present, the transaction runs afoul of the portion of § 741(8) definition of the term "settlement payment" that includes the phrase "any other similar payment *commonly used* in the securities trade." 11 U.S.C. § 741(8)(emphasis added).

The instant matter is distinguishable from those cases cited by the Trustee notwithstanding the allegations raised as to Defendant's employees. While there is no question that McGrath engaged in a massive fraud, the alleged Transfers are bona fide actual purchases of

securities from a market participant. Such transfers do not lose their status as "settlement

payments" merely because the Trustee has alleged that they involved fraud by the Debtors.

2. *Transfer made by, to or for the benefit of a stockbroker in connection with a "securities contract"*

While this Court has determined that the Transfer at issue falls within the definition of

"settlement payments" and thus falls within the purview of the safe harbor provision of § 546(e),

this Court holds that § 546(e) applies to the Transfers for the separate reason that they occurred

in connection with a "securities contract."

Section 546(e) applies when a transfer is made by, to or for the benefit of a stockbroker,

securities clearing agent or other referenced entity in connection with a "securities contract," as

defined in § 741(7) of the Bankruptcy Code. *See* 11 U.S.C. § 546(e).

The Complaint itself alleges that the "Transfers made by the Debtors to the Defendant

[Newbridge Securities] were used to purchase securities, to reimburse the Defendant for

securities previously purchased, or to pay the Defendant commissions." Am. Compl. at ¶ 58.

Thus, the Trustee admits in the Amended Complaint that the Transfers at issue were made to

complete securities transactions. Further, in the Trustee's Memorandum of Law in Opposition

to Newbridge Securities' Motion to Dismiss, the Trustee concedes that Newbridge Securities is a

stockbroker and that the Transfers were made in connection with a securities contract. *See Opp.*

at 16, ECF No. 17. Each of the Transfers is a "securities contract" within the meaning of §

741(7). Accordingly, this provides an additional basis for this Court to determine that the safe

harbor provision of § 546(e) applies to the transfers in the instant matter.

**B.** ***Section 546(e) Requires Dismissal of the State Common Law Claims Pursuant to the Preemption Doctrine***

The Amended Complaint seeks damages for the state law claims asserted in Counts IV (Civil Conspiracy) and V (Aiding and Abetting Civil Conspiracy and Fraud) pursuant to § 544 and applicable non-bankruptcy law.  The Amended Complaint further alleges as to the state law claim in Count VI (Conversion), the Trustee is entitled to recover the Property pursuant to applicable non-bankruptcy law and § 550.  However, as to the claim for Conversion, the Original Complaint asserts that the Trustee is entitled to recover the Debtor's Property pursuant to applicable non-bankruptcy law as well as § 544, not § 550, of the Bankruptcy Code.  Original Compl., ECF No. 1.

The Court will first address the claims asserted in Counts IV and V: the plain language of § 546(e) bars the Trustee's § 544 common law claims as well as claims arising under § 548(a)(1)(B).  Newbridge Securities argues in its Reply to the Trustee's Opposition, the Trustee's claims in Counts IV and V conflict with and pose an obstacle to the implementation of the Congressional objectives underlying § 546(e).  *Reply* ¶ 42, ECF No. 18.  Therefore, allowing the Trustee to recover from Newbridge Securities by asserting the Claims in Counts IV and V to recover the same payment that may not be recovered under the constructive fraudulent conveyance provisions of the Bankruptcy Code would circumvent § 546(e).  Accordingly, this Court finds that Counts IV and V are preempted and must be dismissed pursuant to the safe harbor provision of § 546(e).

As to Count VI, the Court further finds that the claim must be dismissed pursuant to the safe harbor provision of § 546(e).  As discussed in *Standard* Part II.5 above, circumventing the provisions of § 546(e) by merely re-labeling claims but seeking essentially the same relief frustrates the purpose of § 546(e).  *See In re Hechinger Inv. Co. of Del.,* 274 B.R. 71 (D. Del. 2002).  In the Amended Complaint, the Trustee asserts recovery for Count VI pursuant to non-

bankruptcy law and § 550 rather than § 544. However, the Court holds that despite the "re-labeling," Count VI still falls within the purview of § 546(e).

In this particular matter, like in *Hechinger*, the state law claims asserted by the Trustee effectively act as avoidance claims. Allowing the Trustee to pursue these state law claims would permit the Trustee to circumvent the safe harbor provision of § 546(e). Counts IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion) are all based on the same operative facts and seek effectively the same relief – the avoidance and recovery of the transfers or the funds used to make the transfers. *Compare In re Hechinger Inv. Co. of Del.,* 274 B.R. 71, 96 (D. Del. 2002) *with In re Lehman Bros. Holdings Inc.,* 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012).

The state law claims in Counts IV – VI of the Amended Complaint fall within the purview of § 546(e)'s safe harbor provision and must be dismissed.

Because the preemption doctrine applies in the instant matter, this Court need not address the arguments regarding the applicability of the doctrine of *in pari delicto* raised by Newbridge Securities as to those claims that fall under the purview of the safe harbor provision of § 546(e). To the extent that Newbridge raises the doctrine of *in pari delicto* as to any remaining claims, the Court declines to apply the doctrine at the motion to dismiss stage given the fact-intensive nature of the doctrine.

To the extent the Trustee argues that he has standing to pursue the causes of action for Civil Conspiracy (Count IV), Aiding and Abetting Civil Conspiracy (Count V) and Conversion (Count VI), this Court holds that the Plan does not create causes of action but merely preserves causes of action held by the Debtor.

C.  *§ 550(a)*

In the Amended Complaint, the Trustee alleges that:

On October 28, 2008, the Defendant received payments from the Debtors in the amount not less than $1,000,000.00 and other transfers in an amount not now known to the Trustee (the "Transfers").

Am. Compl, ¶ 57.

Counts II (Intentional Fraudulent Transfers) and III (Constructive Fraudulent Transfers) in the Amended Complaint seek the recovery of the value of the Transfers by the Trustee pursuant to § 550(a) of the Bankruptcy Code.   Section 550(a) governs a trustee's recovery of an avoided fraudulent conveyance.

The Trustee has not alleged that Newbridge Securities was a subsequent transferee; therefore, § 550(a)(2) need not be considered.  However, the Trustee does allege that Newbridge Securities is an "initial transferee" under § 550(a)(1).  In *In re Parcel Consultants, Inc.*, the Bankruptcy Court considered the meaning of "initial transferee" for purposes of § 550 and held:

[I]n order to be a "transferee" of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else.

287 B.R. 41, 46 (Bankr. D.N.J. 2002).

In the instant matter, it is unclear at this stage what degree of "dominion and control" Newbridge Securities had over the Transfers.  Newbridge Securities points to the Clearing Agreement between Newbridge Securities and Legent as evidence that Newbridge Securities was not an initial transferee of any of the Transfers and further that the Transfers were not made for its benefit. *Memo of Law in Support of Mot. to Dismiss* at 13, ECF No. 15.  In response, the Trustee referenced an October 28, 2008 wire transfer in the amount of $1,000,000.00 made by U.S. Mortgage to Newbridge Securities as evidence that Newbridge Securities was an initial transferee. *Opp.* at 13, ECF No. 17.  However, in Newbridge Securities' response, Newbridge

Securities argues that while the wire transfer notification seems to indicate that $1,000,000.00 was transferred on October 28, 2008 from U. S. Mortgage's account at Capital One Bank to Newbridge Securities account, the $1,000,000.00 was actually wired to Legent's account. *Response* at 5, ECF 18.

This Court finds that the record is inadequate, as a matter of law, to determine whether Newbridge Securities was an "initial transferee," which would enable the Trustee to recover the value of the Transfers pursuant § 550(a). Accordingly, while Count III (Constructive Fraudulent Transfer) is dismissed under the safe harbor provision of § 546(e), the Court denies Newbridge Securities' Motion to Dismiss as to Count II (Intentional Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A) only).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement with respect to allegations of fraud. The rule states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake...." Fed. R. Civ. P. 9(b). "Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Lum v. Bank of America,* 361 F.3d 217, 224 (3d Cir. 2004), *cert. denied,* 128 S. Ct. 615 (2007)(citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied,* 469 U.S. 1211 (1985)). This Court finds that the Trustee has met the heightened pleading requirement of Rule 9(b) with respect to the claim for Intentional Fraudulent Transfers (Count II).

### D. *Claim for Accounting (Count I)*

As a matter of law, the Court is not prepared to rule as to whether a fiduciary relationship existed in the instant matter. The Trustee has alleged that the Debtors and Newbridge Securities

[55]

were in a fiduciary relationship because the Debtors delegated discretionary trading authority to

Newbridge Securities. *Opp.* at 12, ECF No. 17. This Court finds merit in the Trustee's

argument that discovery regarding the nature of such relationship is necessary. *Id.* Because the

finding of a fiduciary relationship is necessary to granting the claim for accounting, this Court

denies the Motion to Dismiss as to the Claim for Accounting (Count I). *See Borough of*

*Kenilworth v. Graceland Memorial Park Ass'n*, 199 A. 716, 717 (N.J. Ch. Div. 1938).

Finally, to the extent the Trustee has clarified that he is seeking recovery of only one

transfer, the October 28, 2008 $1,000,000.00 transfer, the Trustee shall be granted leave to file a

second amended complaint within thirty (30) days from the date of this Opinion.

## II.    *Vining Sparks' Motion to Dismiss*

### A.    *Applicability of the § 546(e) Safe Harbor Provision*

As to the Original Complaint (ECF # 1), this Court finds that the safe harbor provision of §

546(e) mandates dismissal as to those claims in Count II (Preference), Count III (Fraudulent

Transfers) arising under § 548(a)(1)(B) and § 544 (incorporating state law claims) but not §

548(a)(1)(A), as well as those claims in Counts IV (Civil Conspiracy), V (Aiding and Abetting

Civil Conspiracy and Fraud), and VI (Conversion).

As to the Proposed Amended Complaint (ECF # 4-2), this Court finds that the safe harbor

provision of § 546(e) mandates dismissal as to Count II (Preference), Count III (state law claims

to avoid intentional fraudulent transfers pursuant to the Trustee's strong-arm powers under § 544

only), Count IV (Constructive Fraudulent Transfers), V (Civil Conspiracy), VI (Aiding and

Abetting Civil Conspiracy and Fraud), and VII (Conversion).

This Court reaches such a conclusion because the Transfers fall within the meaning of

"settlement payments" as defined by the Bankruptcy Code and Third Circuit case law. Second,

[56]

§ 546(e) also applies when a transfer is made by, to or for the benefit of a stockbroker, securities

clearing agent or other referenced entity in connection with a securities contract. Further, this

Court holds that § 546(e) bars the assertion of the state common law claims pursuant to the

Preemption Doctrine. Labeling these actions as state common law claims for damages cannot

circumvent the provisions of § 546(e).

     *1.  Settlement Payments*

     Section 741 of the Bankruptcy Code defines "settlement payment" as "a preliminary

settlement payment, a partial settlement payment, an interim settlement payment, a settlement

payment on account, a final settlement payment or *any other similar payment commonly used in*

*the securities trade*." 11 U.S.C. § 741(8) (emphasis added).

     The Third Circuit, in *In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), further defined

the term "settlement payment." In that case, the court held that "[i]n the securities industry, a

settlement payment is generally the transfer of cash or securities made to complete a securities

transaction." 181 F.3d at 515 (citing *Kaiser Steel Corp v. Charles Schwab & Co.*, 913 F.2d 846,

849 (10th Cir. 1990)). The court further held that the term "settlement payment" is a broad one

that "includes almost all securities transactions." *Id.*

     The Complaint itself alleges that the "payments made by the Debtors to the Defendant

[Vining Sparks] were used to purchase securities, to reimburse the Defendant for securities

previously purchased, or to pay the Defendant commissions on behalf of one or more of the

Customers." Compl. at ¶ 14, ECF # 1. Thus, even the Trustee admits in the Complaint that the

transfers at issue were made to complete securities transactions. Accordingly, the transfers

constitute settlement payments under Third Circuit case law. *See In re Resorts Int'l, Inc.,* 181

F.3d 505, 515 (3d Cir. 1999).

Further, this Court finds that the exception to whether a transfer constitutes a "settlement payment" does not apply in the instant matter. The Trustee urged this Court to apply the holdings of *In re Grafton Partners*, 321 B.R. 527 (B.A.P. 9th Cir. 2005), *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406 (S.D.N.Y. 2001), and *Wider v. Wootton* (*In re Wider*), 907 F.2d 570 (5th Cir. 1990). In those cases, the courts declined to apply § 546(e) in cases involving phantom or fictitious securities transactions and transfers that are either illegal or not normally regarded as part of the settlement process. The rationale behind such holdings is that systemic fraud affects whether a transaction properly constitutes a "settlement payment." When systemic fraud is present, the transaction runs afoul of the portion of the § 741(8) definition of the term "settlement payment" that includes the phrase "any other similar payment *commonly used* in the securities trade." 11 U.S.C. § 741(8)(emphasis added).

The instant matter is distinguishable from those cases cited by the Trustee notwithstanding the allegations raised as to Defendant's employees. While there is no question that McGrath engaged in a massive fraud, the alleged Transfers are bona fide actual purchases of securities from a market participant. Such transfers do not lose their status as "settlement payments" merely because the Trustee has alleged that they involved fraud by the Debtors.

2. *Transfer made by, to or for the benefit of a stockbroker in connection with a "securities contract"*

While this Court has determined that the Transfers at issue fall within the definition of "settlement payments" and thus fall within the purview of the safe harbor provision of § 546(e), this Court holds that § 546(e) applies to the Transfers for the separate reason that they occurred in connection with a "securities contract."

[58]

Section 546(e) applies when a transfer is made by, to or for the benefit of a stockbroker, securities clearing agent or other referenced entity in connection with a "securities contract," as defined in § 741(7) of the Bankruptcy Code. *See* 11 U.S.C. § 546(e).

In the supplemental letter submitted to the Court on April 5, 2013, counsel for Vining Sparks stated that Vining Sparks is a registered securities broker-dealer with FINRA and the SEC. There is no question or dispute that Vining Sparks is a stockbroker. The Complaint alleges Vining Sparks "provided services to Michael McGrath ("McGrath"), U.S. Mortgage and/or an entity owned and/or controlled by McGrath (collectively, the "Customers") assisting them with the purchase and sale of security instruments". (Compl. ¶ 10; *see* Amended Compl. ¶ 48). The Complaint asserts that the payments to Vining Sparks "were used to purchase securities to reimburse the Defendant for securities previously purchased, or to pay the Defendant commissions on behalf of one or more of the Customers." (Compl. ¶ 14; Amended Compl. ¶ 58). Accordingly, this provides an additional basis for this Court to determine that the safe harbor provision of § 546(e) applies to the transfers in the instant matter.

### 3. Section 546(e) Requires Dismissal of the State Common Law Claims

The Original Complaint alleges that the state law claims in Counts IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud) and VI (Conversion) are avoidable by the Trustee pursuant to § 544 and applicable non-bankruptcy law. The plain language of § 546(e) bars the Trustee's § 544 common law claims. Accordingly, this Court finds that under the Original Complaint, those claims asserted in Counts IV-VI must be dismissed pursuant to the safe harbor provision of § 546(e).

The Proposed Amended Complaint alleges that the state law claims in Counts V (Civil Conspiracy) and VI (Aiding and Abetting Civil Conspiracy and Fraud) are avoidable by the

Trustee pursuant to § 544 and applicable non-bankruptcy law. The plain language of § 546(e) bars the Trustee's § 544 common law claims. Accordingly, under the Proposed Amended Complaint, those claims asserted in Counts V and VI must be dismissed pursuant to the safe harbor provision of § 546(e).

The Proposed Amended Complaint further alleges that under Count VII (Conversion), the Trustee is entitled to recover the Property pursuant to § 550 and applicable non-bankruptcy law. As discussed in *Legal Standard* II.5 above, circumventing the provisions of § 546(e) by merely re-labeling claims but seeking essentially the same relief frustrates the purpose of § 546(e). *See In re Hechinger Inv. Co. of Del.,* 274 B.R. 71 (D. Del. 2002). In the Proposed Amended Complaint, the Trustee asserts recovery for Count VII pursuant to non-bankruptcy law and § 550 rather than § 544. However, the Court holds that despite the "re-labeling," Count VII still falls within the purview of § 546(e).

In this particular matter, like in *Hechinger*, the state law claims asserted by the Trustee effectively act as avoidance claims. Allowing the Trustee to pursue these state law claims would permit the Trustee to circumvent the safe harbor provision of § 546(e). Counts V (Civil Conspiracy), VI (Aiding and Abetting Civil Conspiracy and Fraud), and VII (Conversion) of the Proposed Amended Complaint are all based on the same operative facts and seek effectively the same relief – the avoidance and recovery of the transfers or the funds used to make the transfers. *Compare In re Hechinger Inv. Co. of Del.,* 274 B.R. 71, 96 (D. Del. 2002) *with In re Lehman Bros. Holdings Inc.,* 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012).

Accordingly, this Court finds that under the Proposed Amended Complaint, those claims asserted in Counts V-VII must be dismissed pursuant to the safe harbor provision of § 546(e).

Because the preemption doctrine applies in the instant matter, this Court need not address the arguments regarding the applicability of the doctrine of *in pari delicto* raised by Vining Sparks as to those claims that fall under the purview of the safe harbor provision of § 546(e). To the extent that Vining Sparks raises the doctrine of *in pari delicto* as to any remaining claims, the Court declines to apply the doctrine at the motion to dismiss stage given the fact-intensive nature of the doctrine.

To the extent the Trustee argues that he has standing to pursue the causes of action for Civil Conspiracy (Count V), Aiding and Abetting Civil Conspiracy (Count VI) and Conversion (Count VII), this Court holds that the Plan does not create causes of action but merely preserves causes of action held by the Debtor.

### 4. Section 546(e) Requires Dismissal of the Preference Claim in Count II

Both the Original Complaint and the Proposed Amended Complaint seek avoidance and recovery of Preferential Transfers (Count II) pursuant to § 547(b) and § 550 of the Bankruptcy Code. The plain language of § 546(e) bars claims arising pursuant to § 547. Accordingly, this Court finds that under both the Original Complaint and the Proposed Amended Complaint, the claim asserted in Count II must be dismissed pursuant to the safe harbor provision of § 546(e).

### B. *§ 548(a)(1)(A) Intentional Fraud Claim and the Good Faith Transferee Exception*

Vining Sparks has not demonstrated that it is entitled, as a matter of law, to have the § 548(a)(1)(A) Intentional Fraud claim (Count III) dismissed. Vining Sparks argues that this Court need not engage in a factual investigation once the Court has made the determination that the transactions in questions are settlement payments pursuant to § 548(d). However, this Court holds that a determination of whether Vining Sparks gave value for the transfers, which would trigger the good faith transferee provision of § 548(c), is not appropriate at this stage.

### C. *Timeliness of Claims*

As to any § 548(a)(1)(A) claims that remain, claims for any transfers made before the two-

year reach back period are untimely. The U.S. Mortgage Petition Date was February 23, 2009,

and the two-year reach back period extends to February 23, 2007.[3] The Complaint alleges that

the Transfers occurred between February 25, 2005 and December 15, 2008. Accordingly, claims

for transfers that were made before February 23, 2007 are untimely and must be dismissed.

### D. *Claim for Accounting (Count I)*

As a matter of law, the Court is not prepared to rule as to whether a fiduciary relationship

existed in the instant matter. The Trustee has alleged that the Debtors and Vining Sparks were in

a fiduciary relationship because the Debtors delegated discretionary trading authority to Vining

Sparks. *Opp.* at 10, ECF No. 5. This Court finds merit in the Trustee's argument that discovery

regarding the nature of such relationship is necessary. *Id.* Because the finding of a fiduciary

relationship is necessary to granting the claim for accounting, this Court denies the Motion to

Dismiss as to the Claim for Accounting (Count I). *See Borough of Kenilworth v. Graceland*

*Memorial Park Ass'n*, 199 A. 716, 717 (N.J. Ch. Div. 1938).

### III.  *Trustee's Cross-Motion for an Order Authorizing the Liquidating Trustee to File an Amended Complaint*

A liberal standard governs pleading amendments, as articulated by the Supreme Court in

*Foman v. Davis,* 371 U.S. 181, 182 (1962) and the text of Fed. R. Civ. P. 15(a)(2)("leave shall be

freely given when justice so requires.") Further, the Third Circuit has held that if a claim is

vulnerable to dismissal under Rule 12(b)(6) and the plaintiff moves to amend, "leave to amend

---

[3] The CU National Petition Date was April 1, 2009. Therefore, the two-year reach back period for any transfers that
relate to CU National is April 1, 2007.

generally must be granted unless the amendment would not cure the deficiency." *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir. 2000).

In the instant matter, this Court undertakes an analysis to determine whether permitting the Trustee's Cross-Motion for Entry of an Order Authorizing Trustee to File an Amended Complaint would be "futile" given this Court's rulings on Vining Sparks' Motion to Dismiss. *See Foman v. Davis,* 371 U.S. 181, 182 (1962)("In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment,* etc. – the leave sought should, as the rules require, be "freely given.")(emphasis added).

Under the Original Complaint, Count II (Avoidance and Recovery of Preferential Transfers), Count III (Constructive Fraudulent Transfers and state law claims under § 544 only), and Counts IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion) are all dismissed pursuant to the safe harbor provision of § 546(e). Counts I (Accounting), and claims arising under § 548(a)(1)(A) under Count III remain.

Under the Proposed Amended Complaint, Counts II (Preference), Count III (state law claims to avoid intentional fraudulent transfers pursuant to the Trustee's strong-arm powers under § 544 only), IV (Constructive Fraudulent Transfer), V (Civil Conspiracy), VI (Aiding and Abetting Civil Conspiracy and Fraud), and VII (Conversion) are all dismissed pursuant to the safe harbor provision of § 546(e). Counts I (Accounting) and III (Intentional Fraudulent Transfers) under 11 U.S.C. 548(a)(1)(A) only remain.

Based on the holdings of this Court as they pertain to Vining Sparks' Motion to Dismiss, the proposed amendment only affects the factual information contained in the complaint as well separating the Fraudulent Transfer claim into separate claims for Intentional Fraudulent Transfers and Constructive Fraudulent Transfers.

This Court finds that under Fed. R. Civ. P. 15(a)(2) and the standard articulated in *Foman v. Davis*, the Trustee's Cross-Motion for Entry of an Order Authorizing Trustee to File an Amended Complaint should be granted to the extent consistent with this Opinion.

However, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement with respect to allegations of fraud. The rule states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake...." Fed. R. Civ. P. 9(b). "Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Lum v. Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004), *cert. denied*, 128 S. Ct. 615 (2007) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)). Accordingly, the Trustee must meet the heightened pleading requirement of Rule 9(b) with respect to the claim for Intentional Fraudulent Transfers (Count III). More precision shall be injected into the amended complaint by setting forth the specific individual transfers at issue here, including the dates of the transfers.

CONCLUSION

For the foregoing reasons, Newbridge Securities' Motion to Dismiss the Complaint is GRANTED IN PART and DENIED IN PART. Vining Sparks' Motion to Dismiss the Complaint is GRANTED IN PART and DENIED IN PART. The Liquidating Trustee's Motion for Entry of an Order Authorizing Trustee to File an Amended Complaint in *Bond v. Vining*

*Sparks*, Adv. Pro. No. 11-1212 is GRANTED in compliance with the ruling of the Court in this

Opinion.  Said Amended Complaint shall be filed and served within thirty (30) days of the date

of this Opinion.

An order shall be submitted in accordance with this Opinion.

DATED:  April 23, 2013

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE

[65]